Joseph NEMEC, Plaintiff
Below, Appellant,

v.

Ralph W. SHRADER, et al.,
Defendants Below,
Appellees.

Gerd Wittkemper, Plaintiff
Below, Appellant,

v.

Ralph W. Shrader, et al., Defendants
Below, Appellees.

Nos. 305, 2009, 309, 2009.

Supreme Court of Delaware.

Submitted: Feb. 17, 2010.
Decided: April 6, 2010.

Henry E. Gallagher, Jr. (argued), Connolly Bove Lodge & Hutz LLP, Wilmington, DE, for appellant Gerd Wittkemper.

Peter J. Walsh, Jr. (argued), Gregory A. Inskip, and Scott B. Czerwonka, Potter Anderson & Corroon LLP, Wilmington, DE, for appellant Joseph Nemec.

David J. Teklits and Kevin M. Coen, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Of Counsel: Everett C. Johnson, Jr. (argued), J. Christian Word and Rebecca S. Giltner, Latham & Watkins LLP, Washington, DC, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice, HOLLAND and RIDGELY, Justices for the Majority.

Booz Allen ("the Company") redeemed Joseph Nemec's and Gerd Wittkemper's stock after their post-retirement put rights expired, but before selling its government business division. Nemec and Wittkemper asserted, and the Chancellor dismissed, claims that the board breached the Company's Stock Plan's implied covenant of good faith and fair dealing, and its fiduciary duty; and unjustly enriched itself. Because the board exercised an express contractual right, we **AFFIRM** the judgment of the Court of Chancery.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties

Nemec retired from Booz Allen on March 31, 2006, after nearly 36 years of

service with the Company. Nemec was elected three times to the Company's board of directors, where he served on the Finance and Professional Excellence Committees and chaired the Audit Committee. At the time of his retirement, Nemec ranked third in seniority among Booz Allen partners.

Wittkemper also retired from Booz Allen on March 31, 2006, after nearly 20 years of service with the Company. Wittkemper built the foundation for Booz Allen's German business and helped expand Booz Allen's business throughout Europe. For nine years Wittkemper was a member of Booz Allen's Worldwide Commercial Business Leadership Team. He also served as head of the Communications Media Technology practice, and later as head of Booz Allen's European Business.

Booz Allen, a Delaware corporation headquartered in McLean, Virginia, is a strategy and technology consulting firm. In July 2008, Booz Allen had approximately 300 shareholders, 21,000 employees, and annual revenues of approximately $4.8 billion. Booz Allen was founded as a partnership in 1914, but later changed its legal structure and became a Delaware corporation. Booz Allen retained, however, the attitude and culture of a partnership, owned and led by a relatively small cadre of corporate officers, who were referred to as the "partners."

The individual defendants were members of Booz Allen's board of directors at the time the plaintiffs' Booz Allen shares were redeemed, and at the time the Company sold Booz Allen's government business to The Carlyle Group. The Directors collectively owned about 11% of Booz Allen's outstanding common stock.

### The Booz Allen Stock Rights Plan

Throughout their tenure, Nemec and Wittkemper, along with all other officers of the Company, were partially compensated with annual grants of stock rights that were convertible into common stock of the Company. Those rights were granted under the Booz, Allen & Hamilton Inc. Officers Stock Rights Plan. Under the Stock Plan, each retired officer had a "put" right, exercisable for a period of two years from the date of his or her retirement, to sell his or her shares back to the Company at book value.[1] After that two-year period expired, the Company then had the right to redeem, at any time, part or all of the retired officer's stock at book value.[2]

When they retired in March 2006, Nemec owned 76,000 shares of Booz Allen stock (representing about 2.6% of the Company's issued and outstanding common shares), and Wittkemper owned 28,000 shares (representing almost 1% of those shares). Nemec retained all of his Booz Allen stock during the two-year period following his retirement; Wittkemper sold most of his shares but retained some of them.

### The Carlyle Transaction

In February 2007, Booz Allen reorganized its two principal lines of business into two separate business units: (i) a government unit, which provided consulting services to governments and govern-

---

**1.** Book Value is defined in Section 1(b) of the Stock Plan as "the quotient obtained by dividing (a) the Company's net assets at the end of the fiscal quarter ... by (b) the total number of shares of the Company's Common Stock and Class A Non–Voting Common Stock issued and outstanding at the end of the fiscal quarter."

**2.** The Stock Plan provides for the "repurchase" of shares by the Company. In this Opinion we adhere to the term "redemption," which was used by the parties and the Chancellor.

mental agencies, and (ii) a global commercial unit, which provided services to commercial and international businesses. At that time, Booz Allen's leadership began to consider spinning off one of those two businesses.

During the summer of 2007, Booz Allen's leadership discussed internally a possible transaction in which Booz Allen would sell its government business. In October 2007, Booz Allen and The Carlyle Group began negotiations, which culminated in The Carlyle Group's November 2007 offer to purchase Booz Allen's government business for $2.54 billion.

On January 16, 2008, the Wall Street Journal reported that Booz Allen was engaged "in discussions to sell its government-consulting business to private-equity firm Carlyle Group," and that "the sale price will likely be around $2 billion." They reported that the transaction was expected to close by March 31, 2008. At some point before March 31, 2008, however, Booz Allen's board and management learned that the Carlyle transaction would close later than planned.

In March 2008, Booz Allen's board of directors, in anticipation of the Carlyle transaction, extended their (and management's) terms of office by 90 days, until the end of June 2008, and declined to issue new stock rights to its officers, thus preserving the contemporaneous Booz Allen stock ownership. Booz Allen's commercial

business stockholders also elected the persons who would become the board of directors of a newly formed entity—Booz & Company, Inc.—that would operate Booz Allen's commercial business after the Carlyle transaction closed.[3] By this point, the purchase price of the Carlyle transaction had been agreed upon, and the Booz Allen board and stockholders knew that the transaction would generate over $700 per share to Booz Allen's stockholders.

On May 15, 2008, Booz Allen entered into (i) a formal merger agreement that would result in the sale of its government business to The Carlyle Group,[4] and (ii) a spin-off agreement that would result in the transfer of its commercial business to Booz & Company, Inc. On May 16, 2008, Booz Allen publicly announced the sale of its government business to The Carlyle Group for $2.54 billion. That transaction closed on July 31, 2008—four months after the plaintiffs' put rights expired.[5]

## The Redemption of Plaintiffs' Booz Allen Stock

If allowed to participate in the Carlyle transaction, the plaintiffs would have received materially more than the March 2008 (pre-transaction) book value of their Booz Allen shares. In April 2008, the Company redeemed the plaintiffs' shares at their pre-transaction book value (approximately $162.46 per share).[6] The

---

3. Usually, Booz Allen's board convened a firm-wide nominating committee, composed of a large number of Booz Allen stockholders, to nominate candidates for board membership for the next fiscal year. The nominating committee that convened in late 2007 consisted solely of stockholders from the Commercial side of the business.

4. The merger agreement was amended on July 30, 2008.

5. Booz Allen was the surviving corporation.

6. On March 10, 2008, Ralph Shrader, Booz Allen's chairman and CEO, told Nemec that allowing both Nemec and Wittkemper to retain their Booz Allen stock until the Carlyle transaction closed was an "easy moral decision." The Dissent construes this comment on "morality" as an indication of the parties' legal intent during contractual bargaining and signing 30 years earlier.

April 2008 redemption of the plaintiffs' shares added nearly $60 million to the proceeds received by Booz Allen working stockholders. At the time of the redemptions, Booz Allen was awaiting the receipt of an IRS private opinion letter regarding the tax treatment of the transaction,[7] and the completion of an audit of financials for certain prior fiscal years (which had already been certified). None of the parties to the transaction expected that these events would present problems, and everyone anticipated that both would occur within a matter of days or weeks.

The plaintiffs later filed these actions (which were later consolidated) in the Court of Chancery.

### Procedural History

The plaintiffs' amended complaint asserted three separate claims. Count I alleged that by redeeming the plaintiffs' shares at a time when the Carlyle transaction was virtually certain to occur, Booz Allen breached its covenant of good faith and fair dealing implied in the Stock Plan. Count II claimed that the Directors breached their fiduciary duty of loyalty to the plaintiffs by causing the Company to redeem the plaintiffs' shares, in favor of the Directors' personal interests. Count III alleged that as a result of the improper redemptions, the Directors were unjustly enriched.

The defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The Chancellor granted the motion and dismissed the complaint in its entirety. This appeal followed.

### ANALYSIS

■■ This Court reviews *de novo* the grant of a motion to dismiss under Court of Chancery Rule 12(b)(6), "to determine whether the trial judge erred as a matter of law in formulating or applying legal precepts."[8] Dismissal is appropriate only if it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts susceptible of proof.[9] In reviewing the grant of a motion to dismiss, we view the complaint in the light most favorable to the non-moving party, "accepting as true their well-pled allegations and drawing all reasonable inferences that logically flow from those allegations. We do not, however, blindly accept conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiffs' favor."[10]

### *The Chancellor Properly Dismissed Count I*

■ The implied covenant of good faith and fair dealing involves a "cautious enterprise," inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.[11] "[O]ne generally cannot base a claim for breach of the implied

---

7. Booz Allen's request for the opinion letter was filed with the IRS in February 2008.

8. *Gantler v. Stephens*, 965 A.2d 695, 703–04 (Del.2009) (quoting *Feldman v. Cutaia*, 951 A.2d 727, 730–31 (Del.2008)).

9. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006); *Feldman*, 951 A.2d at 731 (quoting *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 610–11 (Del.2003)).

10. *Gantler*, 965 A.2d at 703–04.

11. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del.2005) (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del.1996); *Cincinnati SMSA Ltd. P'ship v. Cincinatti Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.1998)).

covenant on conduct authorized by the agreement."[12] We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.[13] When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting[14] and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.

The plaintiffs lacked "a reasonable expectation of participating in the benefits" of the Carlyle transaction.[15] Shrader's gratuitous, post-contracting remark and the Company's actions implementing the Company's contracted for redemption rights cannot outweigh the clearly written, express, contractual language.[16]

■ The complaint's allegation that the Company, a Delaware corporation, would not be for sale in whole or in part during the redemption period, and that no one at the time of drafting and adopting the Stock Plan could have anticipated that possibility (and if they had, all parties would have agreed to compensate retired stockholders as if they had contributed to the deal's value) stands naked, wholly unworthy of the inference that it is fully clothed.[17] The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider—particularly where the contract authorizes the Company to act exactly as it did here.[18]

■ The Chancellor found no cognizable claim for a breach of the implied covenant because the Stock Plan explicitly authorized the redemption's price and timing, and Booz Allen, Nemec, and Wittkemper received exactly what they bargained for under the Stock Plan. The Chancellor wrote "[c]ontractually negotiated put and call rights are intended by both parties to be exercised at the time that is most advantageous to the party invoking the option."[19]

■ No facts gleaned from the complaint suggest that anyone negotiating for the working stockholders would have made

12. *Dunlap*, 878 A.2d at 441.

13. *Id.* at 442.

14. *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del.Ch.2000) (analyzing parties' "reasonable expectations at the time of contract formation" in implied covenant claim).

15. *Id.* ("The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct.").

16. *Cincinnati SMSA Ltd. P'ship*, 708 A.2d at 992 ("In the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations. But those cases should be rare and *fact-inten-* sive, turning on issues of compelling fairness.") (emphasis added) (footnote omitted).

17. *Dunlap*, 878 A.2d at 441 ("The [implied] covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.") (quoting *E.I. DuPont de Nemours & Co.*, 679 A.2d at 443).

18. *Id.* ("Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty ... unattached to the underlying legal document.'") (quoting *Glenfed Fin. Corp. v. Penick Corp.*, 276 N.J.Super. 163, 647 A.2d 852, 858 (A.D. 1994)).

19. *Nemec v. Shrader*, 2009 WL 1204346, at *5 (Del.Ch. Apr. 30, 2009).

such a concession—nor does the complaint point to any reason they should have.[20] Nothing except the absence of specific language contemplating a private equity, post retirement buyout supports a view that it can be inferred that had the parties to the Stock Plan specifically addressed the issue *at the time of contract,* they would have agreed to preclude the Company from exercising its redemption right before the Carlyle transaction closed. The implied covenant will not infer language that contradicts a clear exercise of an express contractual right. Our colleagues' thoughtful dissent suggests that we neglect to note that the challenged conduct (redeeming the retired stockholders shares) must *"further a legitimate interest of the party relying on the contract"* [emphasis supplied by the dissent]. The Company's directors, at the time of the decision to redeem owed fiduciary duties to the corporation and its stockholders.[21] The redemption would not affect the Company directly. However, a failure to redeem the now retired stockholders' shares consistent with the Company's right under the stock plan would directly reduce the working stockholders' distribution by $60 million. If the Company's directors had not exercised the Company's absolute contractual right to redeem the retired stockholders shares, the working stockholders had a potential claim against the directors for favoring the retired stockholders to the detriment of the working stockholders.

The Company's redemption of the retired stockholders' shares now produces the retirees' accusation that the Company breached the covenant of fair dealing and good faith implied in the stock plan. The directors did nothing unfair and breached no fiduciary duty by causing the Company to exercise its absolute contractual right to redeem the retired stockholders' shares at a time that was most advantageous to the Company's working stockholders. The fact that some directors were in the group of working stockholders who received a *pro rata* share of the $60 million did not make it an interested transaction because those director stockholders received the same *pro rata* benefit as all other stockholders similarly situated.[22] The directors made a rational business judgment to exercise the Company's contractual right for the $60 million benefit to all working stockholders rather than to take no action and be accused of favoritism to the retired stockholders.

The plaintiffs assert that the Company violated an "implied" obligation to exercise its redemption right in "good faith and to deal fairly with the plaintiffs."[23] The Stock Plan does not address whether retired stockholders should share in any "locked in value" of the Company—surely if discussed or even contemplated during negotiation of the Stock Plan, a reasonable

---

**20.** *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del.Ch. Nov. 10, 1998) ("Since a court can only imply a contractual obligation when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation.") (footnote omitted).

**21.** *North American Catholic v. Gheewalla,* 930 A.2d 92 (Del.2007).

**22.** *Aronson v. Lewis,* 473 A.2d 805 (Del.1984).

**23.** The Dissent cites to *Amirsaleh v. Bd. of Trade of the City of New York,* 2008 WL 4182998 to support its conclusions. *Amirsaleh,* however, is factually distinguishable from this case. As the Chancellor noted, "[T]he Stock plan specifically grants Booz Allen the right to exercise an option to redeem plaintiffs' shares." *Nemec v. Shrader,* 2009 WL 1204346, at *5 n. 10. In *Amirsaleh,* there is no such right.

retiring stockholder would have bargained for the potential release of the "unlocked" value. The complaint alleges no facts that demonstrate that, at the time of contracting, both parties would reasonably have expected Nemec and Wittkemper to participate in the buy out. Nor does the complaint offer us a "cautious" approach to infer contractual terms. Rather, the plaintiffs would have us believe—without justification—that long term stockholders of a prestigious mergers and acquisition consulting firm would have no expectation that a future acquirer would be interested in purchasing all or part of the Company.

 Crafting, what is, in effect, a post contracting equitable amendment that shifts economic benefits from working to retired partners would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing.[24] Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy. As the Chancellor noted in his opinion, the doctrine "'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'"[25] These plaintiff-appellants got the benefit of their actual bargain,[26] and now urge us to expand the doctrine of the implied duty of good faith and fair dealing. A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party. We cannot reform a contract because enforcement of the contract as written would raise "moral questions."[27] The policy underpinning the implied duty of good faith and fair dealing does not extend to post contractual rebalancing of the economic benefits flowing to the contracting parties.[28] Accordingly, we affirm the Chancellor's dismissal of Count I.

### The Chancellor Properly Dismissed Count II

 Count II of the complaint alleges that by causing the Company to redeem the plaintiffs' shares before the Carlyle transaction closed, the Directors acted to further their own economic self-interest, at the expense and to the detriment of the plaintiffs, thereby breaching their fiduciary duty of loyalty. Those allegations, even if true, do not establish an enforceable breach of fiduciary duty claim in the specific circumstances alleged here.

---

24. *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.,* 2006 WL 2521426, at *6 (Del.Ch. Aug. 25, 2006) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare.").

25. *Nemec v. Shrader,* 2009 WL 1204346, at *5 (Del.Ch. Apr.30, 2009) (quoting *Dunlap,* 878 A.2d at 441).

26. *Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 888 (Del.Ch.2009) ("[T]he implied covenant cannot be invoked to override express provisions of a contract.").

27. Myron T. Steele, *Judicial Scrutiny of Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies,* 32 DEL. J. CORP. L. 1, 6 (2007) ("Barring any evidence to the contrary, courts should restrain themselves from reaching any conclusions other than those that the parties, who are perceived to have understood the terms of the written agreement and bargained for and negotiated the relationship created by the contract in exchange for consideration.").

28. *Dunlap,* 878 A.2d at 445 ("[A]bsent grounds for reformation, courts should not rewrite contracts.").

The Chancellor held that the plaintiffs' fiduciary duty claim fails for two reasons. First, the claim seeks to enforce obligations that are expressly addressed by contract (the Stock Plan), and that, therefore, must be adjudicated within the analytical framework of a breach of contract claim.[29] Stated differently, the Chancellor found that the Stock Plan created contract duties that superseded and negated any distinct fiduciary duties arising out of the same conduct that constituted the contractual breach. Second, the Chancellor held that the complaint did not adequately plead facts sufficient to establish that the timing of the Directors' redemption decision was contrary to the exercise of the Directors' sound and good faith business judgment.[30] Because we affirm the dismissal of Count II on the first ground articulated by the Chancellor, we do not reach the second.

■ It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.[31]

The plaintiffs argue that the Chancellor legally erred by concluding that the Stock Plan foreclosed their breach of fiduciary duty claim. Although the plaintiffs concede that both their contract and fiduciary claims have a "common nucleus of operative facts," the fiduciary duty claim, they contend, is grounded on an additional and distinct fact [32]—namely, that the Directors were the persons responsible for the Company's decision to redeem the plaintiffs' shares before the Carlyle transaction closed, and stood to gain personally from that decision.

This contention, in our view, lacks merit. Even though the Directors caused the Company to redeem the plaintiffs' shares when it did, the fiduciary duty claim still arises from a dispute relating to the exercise of a *contractual* right—the Company's right to redeem the shares of retired nonworking stockholders. That right was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract. Rather, that right was solely a creature of contract, and attached only to those shares that retired stockholders acquired under the Stock Plan. As a consequence, the nature and scope of the Directors' duties when causing the Company to exercise its right to redeem shares covered by the Stock Plan were intended to be defined solely by reference to that contract.[33] Any separate fiduciary duty claims that might arise out of the Company's exercise of its contract right, therefore, were foreclosed. Accordingly, the Chancellor committed no error

---

29. *Nemec*, 2009 WL 1204346 at *4 (citing *Madison Realty Partners 7, LLC. v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del.Ch. Apr. 17, 2001); *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch.2006); and *Gale v. Bershad*, 1998 WL 118022, at *5 (Del.Ch. Mar. 4, 1998)).

30. *Id.*

31. *Blue Chip Capital Fund*, 906 A.2d at 833; *Gale*, 1998 WL 118022, at *5.

32. *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10 (Del.Ch. June 13, 2008).

33. See *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del.Ch.1986) ("with respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract.")

by dismissing the fiduciary claim in Count II.[34]

### The Chancellor Properly Dismissed Count III

■ Count III claims that the Directors were unjustly enriched by the pre-transaction redemption of the plaintiffs' Booz Allen shares. The Chancellor dismissed this Count on two alternative grounds. The first is that "the alleged wrong [which made the Directors' enrichment unjust] arises from a relationship governed by contract" (i.e., the Stock Plan) and "Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract." The second is that Booz Allen properly exercised its redemption right under the Stock Plan.[35] Because we affirm the dismissal of Count III of the complaint solely on the first ground, we do not reach the second.

■ Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[36] The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[37]

The plaintiffs contend that the complaint adequately pleads these elements. Although the plaintiffs' complaint pleads the first four elements, it fails to establish the fifth requirement, that absent an unjust enrichment claim the plaintiffs will have no remedy to recover the benefit of which they were wrongfully deprived. The first three elements of the plaintiffs' unjust enrichment claim are intertwined: the pre-Carlyle transaction redemption of plaintiffs' shares reduced the number of "slices" into which the Carlyle transaction "cake" (a fixed amount) would be cut, thereby enlarging each "slice." As a direct result of that redemption, all remaining Booz Allen working stockholders—and stockholding Directors—received higher value for their shares, equal to the nearly $60 million of transaction consideration of which the plaintiffs allegedly were deprived. Just as the plaintiffs have failed on the merits of their breach of contract claim, they have failed to prove that the Directors' unjustly benefited from the pre-transaction redemption, in contravention of ". . . the fundamental principles of justice or equity and good conscience."[38]

---

**34.** *Moore Bus. Forms v. Cordant Holdings Corp.*, 1995 WL 662685, at *6 (Del.Ch. Nov. 2, 1995) (dismissing claim for breach of fiduciary duty where the plaintiff challenged the implementation by the board of procedures provided for in a contract).

**35.** *Nemec*, 2009 WL 1204346, at *6.

**36.** *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del.1988).

**37.** *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del.Ch.1999); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del.Ch. 1998). "Impoverishment" does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distin-

guished from being deprived of the benefit unjustifiably conferred upon the defendant. *See Metcap Securities LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 n. 26 (Del.Ch. Feb. 27, 2009) (stating that an "impoverishment" is not critical to an unjust enrichment claim because restitution may be awarded based solely on the benefit conferred upon the defendant, even in the absence of an impoverishment suffered by the plaintiff).

**38.** *See Jackson Nat. Life. Ins. Co.*, 741 A.2d at 394 (holding that "it is axiomatic" that plaintiffs sufficiently pled allegations that defendants were unjustly enriched, having sufficiently pled allegations that defendants breached their fiduciary duty or aided and abetted such breach).

Because the plaintiffs have failed to demonstrate each required element, the Chancellor properly dismissed Count III. We therefore need not, and do not, address the correctness of the Chancellor's holding that because the conduct making the Directors' enrichment "unjust" arises from a relationship governed by contract, that contract "alone must provide the measure of the plaintiff's rights."[39] Whether or not that is a correct view of the law, the Chancellor did not err in dismissing Count III of the complaint.

## CONCLUSION

For the foregoing reasons, the Court of Chancery's judgment is **AFFIRMED.**

JACOBS, Justice, dissenting and BERGER, Justice joining in dissent:

The majority holds that, as a matter of law, Booz Allen did not breach the implied covenant of good faith and fair dealing. The majority reasons as follows: The Stock Plan expressly granted the Company, and the Company exercised, an unqualified contractual right to redeem the plaintiffs' shares. The redemption of the plaintiffs' shares in reliance on that contract right did not breach the implied covenant merely because the result was to "simply limit[ ] advantages to the other [contracting] party."[40] We respectfully disagree, because Delaware law does not

support, let alone mandate, such a narrow construction of the implied covenant.

A party does not act in bad faith (the majority argues) by relying on contract provisions for which that party bargained, even if the result is to eliminate advantages the counterparty would otherwise receive. That is a correct, but incomplete, statement of the law. To avoid running afoul of the implied covenant, the challenged conduct must also further a legitimate interest of the party acting in reliance on the contract. Stated differently, under Delaware case law, a contracting party, even where expressly empowered to act, can breach the implied covenant if it exercises that contractual power arbitrarily or unreasonably.[41] Here, the complaint adequately alleges that the Company's redemption of the plaintiffs' shares prejudiced the plaintiffs while serving no legitimate interest of the Company. In those circumstances, therefore, the redemption would have been arbitrary and unreasonable, for which reason the complaint stated a cognizable claim for breach of the implied covenant.

### A. The Scope Of The Implied Covenant

"The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[42] As the majority

---

**39.** *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.,* 2009 WL 264088, at *7 (Del.Ch. Feb. 3, 2009).

**40.** Majority Opinion at 1128.

**41.** *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005) ("Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.") (internal citation omitted).

**42.** *Id.* at 441 (citations omitted). The majority asserts that "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider." Majority Opinion at 1126. That does not accurately express Delaware law. The doctrine does not carve out any exception for "unanticipated" developments that "could have been" anticipated, and no case cited to us so holds. The implied covenant is a "gap filler." Gaps may occur in a contract even if the parties, judicially endowed with perfect rear-view mirror clairvoyance, could be found (after the fact) to have

opinion correctly states, ordinarily the implied covenant doctrine will not be employed to invalidate conduct expressly authorized by the contract itself.[43] But, that principle is not global in its application. The grant of an unqualified contractual right is not, nor can it be, a green light that authorizes the right holder to exercise its power in an arbitrary or unreasonable way.[44] The exercise of any contractual right is limited by the implied duty to act reasonably and in good faith.[45] Accordingly, a contracting party's conduct, even if in "literal compliance with [contract] and statutes," can breach the implied covenant if that party acts arbitrarily or unreasonably.[46]

The complaint alleges no facts from which it may reasonably be inferred that the plaintiffs contractually agreed to waive their implied right to be treated fairly by the Company in any redemption of their shares. Their claim that Booz Allen breached the implied covenant by exercising its power to redeem the plaintiffs' shares in the circumstances alleged here was, therefore, legally cognizable. Whether or not that claim will ultimately be validated must await the development of a factual record. That is why Count I was erroneously dismissed.

been able to anticipate the "gap" issues. *See also Amirsaleh v. Bd. of Trade of the City of New York*, 2008 WL 4182998, at *1 (Del.Ch. Sep. 11, 2008) ("No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency.").

43. *Dunlap*, 878 A.2d at 441.

44. *Amirsaleh*, 2008 WL 4182998, at *1 (Del. Ch. Sep. 11, 2008) ("[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith."). The majority urges that *Amirsaleh* is factually distinguishable, because here the Stock Plan specifically grants Booz Allen the right to redeem the plaintiffs' shares; therefore, these redemptions involved no exercise of discretion. We do not agree. The Company's decision whether or not to redeem was discretionary, in the sense that Booz Allen, as the right holder was not *obligated* to redeem the shares at the time it chose to do that. Exercising a contractual right under circumstances detrimental to the counterparty and where the right holder has nothing to gain, is arguably not in good faith, unless the contract expressly allows the exercise for any (or even no) reason. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981), citing *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.Supp. 773 (S.D.N.Y.1969) ("particular conduct that would have been barred by the duty of good faith could be expressly consented to in the contract."). *See also Wilmington*

*Leasing, Inc. v. Parrish Leasing Co., LP*, 1996 WL 560190, at *2 (Del.Ch. Sep. 25, 1996) (stating that although the removal of a general partner was "generally addressed [in the partnership agreement], the specific question presented here—the scope of discretion allowed to the limited partners in effecting the general partner's removal—is not. The disputed provision does not, for example, explicitly state that the limited partners' determination will be 'in their sole discretion.' ").

45. *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity*, 624 A.2d 1199, 1206 (Del. 1993) (holding that where a "Partnership Agreement provides the General Partner discretionary authority to exclude a limited partner from participation in an investment when participation would have a material adverse effect, the General Partner is obliged to exercise that discretion in a *reasonable* manner. Reasonableness is a question of fact to be determined by the finder of fact.") (emphasis in original); *see also Wilmington Leasing*, 1996 WL 560190, at *2–3. (holding that limited partners' power to remove general partner is limited by the implied covenant and must be exercised reasonably and in good faith, and that an allegation that the decision to remove the limited partner was made unreasonably, necessarily places material facts in dispute, thereby precluding judgment on the pleadings).

46. *Dunlap*, 878 A.2d at 444.

*B. The Complaint Sufficiently Alleges That The Company Did Not Exercise Its Redemption Right in Good Faith*

The majority concede that the Stock Plan does not address whether retired stockholders can share in any "locked in value" of the Company.[47] They insist, however, that "[t]he complaint alleges no facts that demonstrate that, at the time of contracting, both parties would reasonably have expected [the plaintiffs] to participate in the buy out."[48] We conclude otherwise.

The Carlyle transaction, as timed in relation to the redemptions effected here, was an unforeseen circumstance not provided for by the Stock Plan. That frames the issue, which is whether the complaint pleads facts from which one can infer that if the parties negotiating the Stock Plan had specifically addressed the circumstances presented here, they would have agreed that the Company could not exercise its redemption right before the transaction closed. A fair reading of the complaint requires an affirmative answer to that question.

It is fairly inferable that the redemption of the plaintiffs' shares served no legitimate interest of Booz Allen. Once Booz Allen's government business was sold to The Carlyle Group, the Company would cease to exist as a "partner-owned" corporation, and Booz Allen would become a wholly owned Carlyle Group subsidiary. Second, the complaint alleges that the transaction—which would result in Booz Allen's metamorphosis from a "partner-owned" entity to a wholly owned subsidiary—*was all but certain to occur before the Company's redemption right legally came into existence.* Accepting that averment as true, as we must at this stage, no legitimate interest of Booz Allen would be furthered—or even implicated—by redeeming the plaintiffs' shares before the Carlyle transaction closed. Third, the Stock Plan's purpose was to incentivize partners to work diligently for the long term benefit of the Company,[49] and the plaintiffs were still "working partners" when the Stock Plan was adopted. It thus is reasonably inferable that if the matter had been explicitly negotiated, the Company would have agreed to refrain from exercising its future redemption right where (i) it would incur no cost from refraining and (ii) a pre-closing redemption would materially prejudice partners that the Stock Plan was intended to incentivize. In short, the sole effect of the pre-closing redemption was (allegedly) to transfer to the working partners $60 million that the plaintiffs would otherwise have received from the $2.5 billion Carlyle proceeds.[50]

The majority suggest that our view would "expand" the doctrine of the implied duty of good faith and fair dealing and "vitiate the limited reach" of that concept.[51] To the contrary, we submit that our approach accurately reflects existing

---

**47.** Majority Opinion at 1127.

**48.** *Id.*

**49.** The Stock Plan's preamble provides that the plan "is established ... to provide incentives for [the Company's] Officers to continue to serve as employees of the Company and its subsidiaries."

**50.** The allegation that the plaintiffs had a reasonable expectation of sharing in the benefits of the Carlyle transaction is factually bol-stered by CEO Shrader's representation that the plaintiffs would be allowed to cash out their Booz Allen shares in the transaction, and that not redeeming the plaintiffs' shares pre-closing was an "easy moral decision." It is further supported by the extraordinary measures taken by Booz Allen's board before the transaction closed specifically to preserve the ownership *status quo,* including not issuing annual stock rights in 2008.

**51.** Majority Opinion at 1128.

Delaware law, and that it is the majority's view of the doctrine's reach that is unduly crabbed.

It is now settled Delaware law that a contracting party's exercise of a power in reliance on an explicit contractual provision may be deemed "arbitrary" or "unreasonable" where the other contracting party is thereby disadvantaged and no legitimate interest of the party exercising the right is furthered by doing so.[52] *Dunlap v. State Farm Fire & Cas. Co,*[53] a case where this Court most recently addressed the implied covenant, stands squarely for that proposition.

In *Dunlap,* the plaintiff requested its excess liability insurer to approve a proposed agreement to settle with a primary insurer for an amount less than the underlying primary insurer's coverage limits. The excess insurer refused, relying on a contractual and statutory "exhaustion of primary insurance" requirement.[54] Although the insurer had no improper motive for refusing to consent, this Court found it inferable from the complaint that the insurer's refusal to waive the exhaustion requirement was arbitrary and in breach of the implied covenant. The reasons were that the plaintiff's damages indisputably exceeded all available insurance benefits and a waiver would not have prejudiced the insurer.[55] Here, Booz Allen—like the excess insurer in *Dunlap*—had an express contractual right. Here, as in *Dunlap,* the Company would have incurred

no prejudice by forbearing to exercise that right until after the Carlyle closing. In these circumstances, Booz Allen's exercise of that right before closing, which resulted in material prejudice to the plaintiffs, invokes—and pleads a cognizable claim for breach of—the implied covenant.

. The majority's response rests on a characterization of the Stock Plan as a contract between the plaintiffs and the Company *"negotiating for the working stockholders."*[56] That portrayal does not reflect what actually occurred. To be sure, Booz Allen's "working" stockholders had a conflicting interest in the timing of a redemption: those stockholders clearly stood to gain $60 million from a pre-closing redemption, at the plaintiffs' expense. But the "working" stockholders were not parties to the Stock Plan. Other than the plaintiffs, the only party to that contract (for purposes of this case) was Booz Allen. Nothing in the complaint supports the majority's conclusion *as a matter of law* that Booz Allen was negotiating for the "working" stockholders. That may be the fact, but if it is, that can only be established after the development of a full evidentiary record. That "fact" cannot be decreed as a matter of law on the face of this complaint. The majority's *ipse dixit* puts the rabbit in the hat.

The majority concedes that "[t]he redemption would not affect the Company

---

**52.** Conversely, where the exercise of a contract right does further a contracting party's legitimate interest, Delaware courts *will not* apply the implied covenant, even if the exercise adversely affects the other contracting party. *See Cincinnati SMSA LP v. Cincinnati Bell Cellular Sys.,* 708 A.2d 989 (Del.1998) (refusing to imply restrictions on partner's ability to compete with partnership where the partnership agreement unambiguously precluded partners from competing with respect to specific services offered by the partnership,

but allowed partners to engage in or possess an interest in other business ventures of every kind and description).

**53.** 878 A.2d 434.

**54.** *Id.* at 442–43.

**55.** *Id.* at 444.

**56.** Majority Opinion at 1126 (emphasis added).

directly." [57] They suggest, however, that the Company had an indirect interest in eliminating the plaintiffs as shareholders, because a failure to redeem the plaintiffs' shares before the Carlyle transaction closed would reduce the working stockholders' distribution by $60 million. That, in turn, would give the working stockholders "a potential claim against the directors for favoring the retired stockholders to the detriment of the working stockholders." [58]

The demerit of this contention is twofold. First, the majority cites no authority, nor articulates any reasoning, to support its conclusory statement that the working stockholders would have a valid claim for breach of fiduciary duty against the directors for *not* redeeming the plaintiffs' shares. If that is so, then it is equally arguable that the plaintiffs would have had an identical fiduciary duty claim against the directors for causing their shares to be redeemed for the sole benefit of the working stockholders. Second, and more fundamentally, even if the working stockholders arguably had a legitimate economic interest in not being deprived of the $60 million the plaintiffs would otherwise have received, that is an interest that pertains only to the working stockholders—not the Company. Only by conflating the interest of the working shareholders with that of the Company is the majority then able to posit a legitimate corporate interest that the Company then

became entitled (indeed, required) to further. This attribution of the working stockholders' interest to Booz Allen magically puts a second rabbit into the same hat.

At this stage, all that is before us, and before the Court of Chancery, is a motion to dismiss a complaint. At this stage, all that can be decided is whether the complaint states a cognizable legal claim. Whether or not that claim is factually supportable is a question to be resolved at a later stage.[59] We therefore would reverse the dismissal of Count I of the complaint. Because the majority concludes otherwise, we respectfully dissent.[60]

---

57. *Id.* at 1127.

58. *Id.*

59. *See Desert Equities,* 624 A.2d at 1206–08 (reversing judgment on the pleadings in favor of defendant in an implied covenant claim because the reasonableness of a contracting party's exercise of its contractual rights is a question of fact. Whether a plaintiff is able to prove that the defendant exercised its contractual rights in an unreasonable manner "is for another day.").

60. We concur with the majority that Counts II and III of the complaint were properly dismissed because both the breach of fiduciary duty and unjust enrichment claims were foreclosed by the Stock Plan (*i.e.,* the relationship between the parties was governed by contract). We respectfully disagree with the majority's conclusion that the plaintiffs have failed to plead that the directors unjustly benefited from the redemption.