# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| AM GENERAL HOLDINGS LLC, directly and derivatively on behalf of ILSHAR CAPITAL LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | **C.A. No. 7639-VCS** |
| THE RENCO GROUP, INC., IRA L. RENNERT, and ILR CAPITAL LLC, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ILSHAR CAPITAL LLC, | ) ) | |
| Nominal Defendant. | ) | |
| THE RENCO GROUP, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | **C.A. No. 7668-VCS** |
| MacANDREWS AMG HOLDINGS LLC, MacANDREWS & FORBES HOLDINGS INC., and RONALD O. PERELMAN, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| AM GENERAL HOLDINGS LLC, | ) ) | |
| Nominal Defendant. | ) | |

# MEMORANDUM OPINION

Date Submitted: May 29, 2020
Date Decided: June 26, 2020

Daniel A. Mason, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware and Robert A. Atkins, Esquire, Steven C. Herzog, Esquire, Harris Fischman, Esquire and Jeremy A. Benjamin, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for AM General Holdings LLC and MacAndrews AMG Holdings LLC.

Kevin G. Abrams, Esquire, J. Peter Shindel, Jr., Esquire and Matthew L. Miller, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and Andrew J. Frackman, Esquire, Edward N. Moss, Esquire and Moshe Mandel, Esquire of O'Melveny & Myers LLP, New York, New York, Attorneys for The Renco Group, Inc., Ira L. Rennert, and ILR Capital LLP.

**SLIGHTS, Vice Chancellor**

This decision settles the latest conflict in this near decade-old litigation between The Renco Group, Inc. ("Renco") and MacAndrews AMG Holdings LLC ("MacAndrews AMG") regarding the proper construction of perhaps the most intensely contested contract in the history of litigation—the Limited Liability Company Agreement of AM General Holdings LLC ("Holdco"), or "Holdco Agreement."[1]  On March 23, 2020, MacAndrews AMG amended its complaint to ask this Court for an order declaring that the Holdco Agreement does not give Renco a right to consent to a sale of the Capital Stock of Holdco's primary asset, AM General LLC ("AM General").  It has now moved for judgment on the pleadings with respect to this declaration.[2]

---

[1] My nomination of the Holdco Agreement for this dubious honor is supported by the following body of work: *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2019 WL 1567488 (Del. Ch. Apr. 10, 2019); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2017 WL 2167193 (Del. Ch. May 17, 2017); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2016 WL 4440476 (Del. Ch. Aug. 22, 2016);  *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2015 WL 3465956 (Del. Ch. May 29, 2015); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2015 WL 1726418 (Del. Ch. Apr. 9, 2015); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011 (Del. Ch. Jan. 29, 2015); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2014 WL 6734250 (Del. Ch. Nov. 28, 2014); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010 (Del. Ch. Oct. 31, 2013); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2013 WL 3369318 (Del. Ch. June 25, 2013); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 1668627 (Del. Ch. Apr. 18, 2013); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2012 WL 6681994 (Del. Ch. Dec. 21, 2012).

[2] D.I. 859, Supplement to Second Am. Compl. ("SSAC").  Renco answered the SSAC and filed a Counterclaim not relevant to this specific dispute.  D.I. 874.

After carefully considering the matter, I agree with MacAndrews AMG that the Holdco Agreement unambiguously does not grant Renco a consent right. MacAndrews AMG's Motion for Judgment on the Pleadings, therefore, must be granted.

## I. BACKGROUND

I have drawn the facts from the pleadings and from the Holdco Agreement itself, which has been incorporated by reference in the pleadings.[3]

### A. The Consent Right Dispute

MacAndrews AMG began actively pursuing a sale of AM General in September 2018.[4] On February 8, 2019, Renco moved for a preliminary injunction that would require MacAndrews AMG to provide Renco with thirty days' notice before any sale of AM General to allow Renco sufficient time to assert its purported consent right.[5] Without adjudicating the merits of the claim, and as a means to preserve the status quo and allow orderly litigation of the consent issue, I entered an order on March 27, 2019, requiring MacAndrews AMG to give Renco ten days'

---

[3] SSAC ¶ 2.

[4] SSAC ¶ 5.

[5] D.I. 692.

notice before signing any binding deal to sell AM General.[6]  That order remains in place.[7]

In early November 2019, MacAndrews AMG informed Renco that it had found a buyer interested in purchasing all of the Capital Stock of AM General, and provided Renco with proposed sale materials.[8]  Renco again asserted it had a right to consent to any sale; and MacAndrews AMG again refused to assure Renco it would solicit that consent.[9]  MacAndrews AMG alleges this disagreement over Renco's consent right is impeding a sale of AM General and has asked this Court to resolve the issue.[10]

## B. The Relevant Provisions of the Holdco Agreement

According to the Holdco Agreement, MacAndrews AMG, as Managing Member of Holdco, has "the right, power and authority, in the management of the business and affairs of [Holdco], to do or cause to be done any and all acts . . . deemed by the Managing Member to be necessary or appropriate to effectuate the

---

[6] D.I. 711.

[7] MacAndrews AMG's SSAC also requests this Court vacate that order.  SSAC at 10.

[8] SSAC ¶¶ 9–10.

[9] SSAC ¶ 11.

[10] SSAC ¶ 12.

3

business, purposes and objectives of Holdco . . . ."[11]  This wide-ranging, discretionary authority is specifically limited by Section 6.4 of the Holdco Agreement, which lists matters the Managing Member may not pursue or undertake without having first obtained Renco's consent.[12]  The current dispute is centered on the applicability and construction of two such limitations.[13]

First, Section 6.4(a) requires Renco's consent for "any voluntary sale . . . of [Holdco] (including the Capital Stock of any of its Subsidiaries (other than GEP)) not in the Ordinary Course of Business . . . ."[14]  Second, Section 6.4(c) requires Renco's consent for any "AM General Major Decision."[15]  AM General Major Decision is defined in Section 1.1 of the Agreement, which provides, in part, that a AM General Major Decision includes an "AM General Extraordinary Event."[16]  AM General Extraordinary Event, in turn, is defined, in relevant part, as "(ii) the sale

---

[11] Ex. A to Renco's Verified Answer and Countercl. to MacAndrews' Supplement to Second Am. Compl. ("Holdco Agreement") § 6.2.

[12] Holdco Agreement § 6.4.

[13] Renco's consent is also required before the Managing Member may dissolve or liquidate Holdco.  Holdco Agreement § 6.4(f).  For reasons explained below, this limitation on the Managing Member's discretion is not applicable here.

[14] Holdco Agreement § 6.4(a).

[15] Holdco Agreement § 6.4(c).

[16] Holdco Agreement § 1.1 at 9–10.

4

to a Person(s) that is neither (x) a Member nor (y) an Affiliate of AM General . . . of a majority of the Capital Stock of AM General . . . ."[17]

Importantly, an AM General Extraordinary Event is *not* an AM General Major Decision if it occurs "at any time after December 31, 2013 on terms that are no less favorable to [Renco] than to [MacAndrews AMG]."[18]  Put more directly, a sale of all of the Capital Stock of AM General occurring after December 31, 2013, on terms that treat Renco and MacAndrews AMG equally, will not constitute an AM General Major Decision and will not, therefore, trigger MacAndrews AMG's obligation to obtain Renco's consent.[19]

### C. The Parties' Competing Views of Section 6.4

MacAndrews AMG argues the proposed sale is governed by Section 6.4(c) of the Holdco Agreement.[20]  Specifically, it argues the proposed sale is unambiguously an "AM General Extraordinary Event" because it is a sale of "the majority of the Capital Stock of AM General . . . ."[21]  Importantly, under MacAndrews AMG's construction, this particular AM General Extraordinary Event (the proposed sale of

---

[17] Holdco Agreement § 1.1 at 9.

[18] Holdco Agreement § 1.1 at 9–10.

[19] *Id.*

[20] The MacAndrews Parties' Br. in Supp. of Their Mot. for J. on the Pleadings ("OB") 8.

[21] OB 8; Holdco Agreement § 1.1 at 9–10.

5

AM General) is not an AM General Major Decision requiring Renco's consent because the sale will occur after December 31, 2013, on terms no less favorable to Renco than to MacAndrews AMG.[22] In this regard, MacAndrews AMG has represented to Renco that all funds from any sale will be distributed to the parties as required under the Holdco Agreement's waterfall provisions—with no side arrangement that will benefit MacAndrews AMG or any of its affiliates—meaning that, by definition, the sale will be no more favorable to MacAndrews AMG than to Renco.

Renco counters that any sale of AM General is governed by either of two provisions, both of which require Renco's consent. First, Section 6.4(a) is implicated because the proposed sale involves the sale of the Capital Stock of a Holdco subsidiary.[23] In this regard, Renco points out that Section 6.4(a) specifically carves-out a sale of the stock of AM General's engine manufacturing subsidiary, General Engine Products, LLC ("GEP"), from the consent requirement, but contains no such carve out for AM General.[24] According to Renco, this omission underscores that, if the parties had intended to allow MacAndrews AMG to sell AM General without Renco's consent, they knew how to write that exception specifically into

---

[22] *Id.*

[23] Renco's Opp'n to MacAndrews' Mot. for J. on the Pleadings ("AB") 8–14.

[24] Holdco Agreement § 6.4(a).

their agreement.[25]  Its absence, says Renco, is dispositive.  Separately, Renco contends that any sale of AM General will result in the liquidation of Holdco, which requires Renco's consent under Section 6.4(f).[26]  According to Renco, either of these provisions, at least, create an ambiguity in the Holdco Agreement when considered against MacAndrews AMG's proffered construction, thereby precluding judgment on the pleadings.[27]

In the alternative, Renco argues that if this Court were to hold that Section 6.4(c) unambiguously governs whether MacAndrews AMG must solicit Renco's consent prior to a sale of AM General, then that Section must also be construed to give Renco an implied right to receive information regarding the sale before closing.[28]  As Renco sees it, this is the only way it can assess whether the transaction is on terms "no less favorable" to Renco than to MacAndrews AMG, as required by MacAndrews AMG's construction of Section 6.4(c).[29]

MacAndrews AMG responds that Renco's arguments ignore the well-settled canon of construction that, where a specific contractual provision conflicts with a

---

[25] AB 10–11.

[26] AB 14–15.

[27] AB 12–13.

[28] AB 16.

[29] *Id*.

7

general provision, the specific provision governs.[30]  Section 6.4(a), it argues, is a general provision covering asset sales in the abstract, while the definitions embedded in Section 6.4(c) specifically address the sale of the majority of AM General's Capital Stock after a particular point in time.[31]  MacAndrews AMG also argues that Renco's construction, whereby Section 6.4(a) grants it a perpetual consent right, renders the qualifying language in the definition of AM General Major Decision— "after December 31, 2013" and "on terms no less favorable to"—surplusage, in violation of another settled canon of contract construction.[32]  According to MacAndrews AMG, upon applying these canons, the Court must conclude that the operative provisions of the Holdco Agreement are unambiguous and must, therefore, grant judgment on the pleadings.[33]

## II.  ANALYSIS

After the pleadings are closed, Court of Chancery Rule 12(c) allows a party to move for judgment on the pleadings.[34]  In reviewing a motion under Rule 12(c), this court "is required to view the facts pleaded and the inferences to be drawn from

---

[30] OB 11.

[31] OB 10.

[32] OB 15.

[33] OB 8–10.

[34] Ct. Ch. R. 12(c).

8

such facts in a light most favorable to the non-moving party."[35]  With deference to the non-movant in mind, "judgment on the pleadings is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact . . . .  If the contract's meaning is unambiguous, the court must grant judgment on the pleadings in favor of the moving party."[36]

When construing a contract, the court must be mindful that "[a]mbiguity does not exist simply because the parties disagree about what the contract means."[37] Instead, contracts are ambiguous only when the provisions at issue are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[38]

## A. The Relevant Language of the Holdco Agreement is Unambiguous

The overarching theme of Renco's opposition to the Motion is that it would be incongruous for the Court to find the Holdco Agreement provisions relevant to Renco's claimed consent right are unambiguous after it has already determined that nearly every other provision of the contract that the parties have disputed over many

---

[35] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[36] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (quotations omitted).

[37] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[38] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Inc. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

years of litigation was susceptible to competing reasonable constructions.[39]  While I certainly understand (and have lived) Renco's frustration with the parties' inability to make sense of what they agreed to, in this instance, the Holdco Agreement actually makes sense on its face.

When this Court has previously found ambiguity in the Holdco Agreement, that finding followed a determination that both parties had proffered reasonable constructions of the *same* provisions.[40]  In opposing this Motion, Renco is not claiming that ambiguity results from differing, reasonable constructions of the same provisions.  Rather, it has disagreed with MacAndrews AMG as to which of *separate* provisions of the Holdco Agreement unambiguously governs the current proposed sale of AM General.[41]  In other words, resolution of this dispute does not turn on competing constructions of the same provision, but on a determination of which of

---

[39] D.I. 918 Oral Arg. on the MacAndrews Parties' Mot. for J. on the Pleadings ("OA") 28 ("[Counsel for MacAndrews AMG] said repeatedly—I didn't count the number of times. I should have.  But the number of times he used precision, clarity, clear; if there's one thing we know from 15 years of litigation over this Holdco Agreement, it contains none of that."); OA 29 ("We had a trial with respect to claims, arguments, ambiguity arguments that were far weaker than the one presented here . . . .").

[40] *See, e.g.*, *Renco Gp.*, 2015 WL 394011, at *5 (finding each party had proffered a reasonable construction of "AM General Major Decision," "asset," "Ordinary Course of Business," and "affiliate"); *AM Gen. Hldgs.*, 2017 WL 2167193, at *4–6 (finding each party had offered a reasonable construction of Section 9.4(c) and the mechanisms provided in Section 8.3 to enforce Section 9.4(c)'s prohibitory language.).

[41] OA 31–33.

potentially competing, unambiguous provisions applies.  To resolve this dispute, I turn to well-settled canons of contract construction.

"Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[42]  Likewise, it is firmly established that this Court should "interpret contracts as a whole . . . [to] give each provision and term effect, so as not to render any part of the contract mere surplusage, and [] not read a contract to render a provision or term meaningless or illusory."[43]  And, while our Supreme Court has recognized "that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[44]

---

[42] *DCV Hldgs., Inc. v. ConAgra, Inc.* 889 A.2d 954, 961 (Del. 2005).  *See also* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 32:10 (4th ed. 1999) ("When general and specific clauses conflict, the specific clause governs the meaning of the contract") [hereinafter Williston on Contracts]; RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable . . . (c) specific terms and exact terms are given greater weight than general language . . . .").

[43] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quotations omitted).

[44] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 192, 926–27 (Del. 2017)).

Section 6.4(a) gives Renco a consent right for a broad range of transactions, including the sale of "the Capital Stock of any of [Holdco's] subsidiaries . . . ."[45] The Holdco Agreement, however, at Section 6.4(c), specifically carves-out from this consent right the sale of "the majority of the Capital Stock of AM General" after December 31, 2013, as long as the sale is on terms "no less favorable to" Renco.[46] At first glance, these provisions appear to be in conflict. But settled canons of construction allow for harmony. The language referring to the sale of "the majority of the Capital Stock of AM General" after a certain date on defined terms specifically and clearly addresses the sale of AM General that MacAndrews AMG is currently pursuing. The sale, as proposed, is of the majority of AM General's capital stock, it will close after December 31, 2013, and it is, at least as described, on terms no less favorable to Renco than to MacAndrews AMG.[47] The specific provision (Section 6.4(c)), therefore, applies; the general provision (Section 6.4(a)), to the extent it might apply, must give way.[48]

Additionally, Renco's proffered construction would render parts of the AM General Major Decision definition meaningless. If Section 6.4(a) were to

---

[45] Holdco Agreement § 6.4(a).

[46] Holdco Agreement §§ 1.1 at 9–10, 6.4(c).

[47] SSAC ¶¶ 17–18.

[48] *DCV Hldgs.*, 889 A.2d at 961.

govern *all* sales of the Capital Stock of AM General, then the December 31, 2013 cut-off date, and the "on terms that are no less favorable to" qualifier, within the definition of AM General Major Decision would have no purpose. Whether a sale was before or after the cut-off date, and no matter the terms of the sale, Renco, by its lights, would have a consent right under Section 6.4(a). This Court will, when possible, not read a contract in a manner that will "render a provision or term meaningless or illusory."[49] That canon applies in full force here.

Turning to Renco's "liquidation" argument, Renco is correct that the Holdco Agreement does unambiguously provide it with a right to consent to Holdco's liquidation.[50] But that is not what MacAndrews AMG is pursuing here—it proposes to sell AM General's Capital Stock, not to liquidate Holdco.[51] No provision of the Holdco Agreement would automatically trigger Holdco's liquidation after AM General is sold. If MacAndrews AMG does decide to liquidate Holdco after the sale, Renco would then have a right to consent to that process, but not until that decision is made.

Last, Renco argues that MacAndrews AMG's proffered construction— whereby Renco's consent would be required for a sale of one of AM General's

---

[49] *In re Shorenstein*, 213 A.3d at 56.

[50] Holdco Agreement § 6.4(f).

[51] Holdco Agreement § 6.4(f); SSAC ¶ 14.

subsidiaries, but not AM General itself—is nonsensical, and at odds with what reasonable parties would have bargained for and what these parties were attempting to achieve. To be sure, as noted, this Court ought to consider an agreement's overall scheme or purpose when construing it.[52] But that consideration does not license a judicial rewrite of clear contract terms.[53]

Here, the Holdco Agreement is highly bespoke in all aspects, including in its governance scheme. And Renco is correct that the Court has been forced to turn to extrinsic evidence in several instances to discern the parties' contractual intent, and in doing so has considered evidence of what the parties were attempting to achieve in the Holdco Agreement. That exercise, however, is not required to construe the consent provisions at issue here.[54] Against the backdrop of the broad discretion afforded MacAndrews AMG as Managing Member, a scheme whereby MacAndrews AMG may, on its own, negotiate and consummate a sale of AM General after a date certain is not, on its face, nonsensical. More to the point, however, the different treatment of sales under Section 6.4(a) and Section 6.4(c) is what the Holdco Agreement unambiguously provides for, and to the extent this

---

[52] *Town of Cheswold*, 188 A.3d at 820.

[53] *Id.*

[54] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

14

distinction represents a "bad deal" for Renco, it must be remembered that Delaware courts "will not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts; the law enforces both."[55]

## B. The Holdco Agreement Does Not Create an Implied Information Right

Renco last argues that, even if Section 6.4(c) unambiguously governs the proposed sale, that provision must be construed to imply an information right.[56] According to Renco, the Court cannot construe Section 6.4(c) as eliminating Renco's consent right while, at the same time, giving MacAndrews AMG the sole authority, without question, to determine if a proposed sale is on terms equally fair to Renco and MacAndrews AMG.[57] With this in mind, Renco allows that a pre-closing notice requirement, like the one this Court imposed upon MacAndrews AMG last year in its status quo order, is the only means by which it will be able to determine if the proposed transaction is fair in time to act to protect its interests.[58] MacAndrews AMG responds that, because of its broad discretionary powers under

---

[55] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[56] AB 15–19.

[57] AB 16.

[58] *Id.*

Section 6.2, it has sole authority to determine if the transaction falls within the Section 6.4(c) carve-out.[59]

As a practical matter, the parties' dispute over Renco's information rights is really a dispute over what remedies should be available to Renco if there were a sale of AM General on terms that were less favorable to Renco than to MacAndrews AMG (e.g., if MacAndrews AMG negotiated some sort of side deal to channel consideration in its direction). Renco believes it should be given notice so that it can move to enjoin a potentially unfair transaction.[60] MacAndrews AMG responds that the parties agreed Renco would not have a consent right, made no explicit provision for information rights and, therefore, implicitly understood that Renco's remedy for an unfair transaction would likely be limited to a post-closing action for damages.[61]

The AM General Major Decision carve-out does not specify who is to determine if a proposed sale is fair to Renco.[62] Without a specific provision on point, I turn to the broader allocation of authority under the Holdco Agreement in Section 6.2.[63] That provision grants MacAndrews AMG, as Managing Member,

---

[59] The MacAndrews Parties' Reply Br. in Supp. of Their Mot. for J. on the Pleadings ("RB") 6.

[60] OA 35–40.

[61] OA 23–24.

[62] Holdco Agreement § 1.1 at 9–10.

[63] Holdco Agreement § 6.2.

broad power to manage Holdco in any manner "deemed *by the Managing Member* to be necessary or appropriate . . . ."[64] This authority, as mentioned, is limited only as specifically enumerated in Section 6.4.[65] Having determined Section 6.4 does not provide Renco with a consent right or otherwise limit MacAndrews AMG's authority to sell a majority of the Capital Stock of AM General, there is no provision in the Holdco Agreement that would limit MacAndrews AMG's managerial power to determine the terms of that sale. If Renco believes MacAndrews AMG has not exercised these powers in good faith, or is otherwise troubled by the terms of the sale, it can pursue its remedies as available.

## III.  CONCLUSION

Based on the foregoing, MacAndrews AMG's Motion for Judgment on the Pleadings is **GRANTED**.

**IT IS SO ORDERED.**

---

[64] *Id.* (emphasis provided).

[65] *Id.*