**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| EARTH PRIDE ORGANICS, LLC and LTG, INC. f/k/a LANCASTER FINE FOODS, INC., | ) ) ) ) |
| Plaintiffs, | ) C.A. No.: N23C-05-009-EMD CCLD ) |
| v. | ) ) |
| CORONA-ORANGE FOODS INTERMEDIATE HOLDINGS, LLC, | ) ) ) |
| Defendant. | ) ) |

Submitted:  October 11, 2024
Decided: December 20, 2024

*Upon Plaintiffs' Motion for Leave to File Second Amended Complaint*
***GRANTED in part DENIED in part***

Jamie L. Brown, Esquire, Brendan Patrick McDonnell, Esquire, Heyman Enerio Gattuso & Hirzel, LLP, Wilmington, Delaware, Michael D. Adams, Esquire, Lucas K. Hori, Esquire, Rutan & Tucker, LLP, Irvine, California. *Attorneys for Plaintiffs Earth Pride Organics, LLC and LTG Inc. f/k/a Lancaster Fine Foods, Inc.*

Brian M. Rostocki, Esquire, Anne M. Steadman, Esquire, Reed Smith, LLP, Wilmington, Delaware, Michael Leib, Esquire, Reed Smith, LLP, New York, New York. *Attorneys for Defendants Corona-Orange Foods Intermediate Holdings, LLC.*

**DAVIS, J.**

## I.    INTRODUCTION

This civil action is a breach of contract and fraud claim assigned to the Complex Commercial Litigation Division of the Court.  Plaintiffs Earth Pride Organics, LLC ("EPO"), and LTG, INC, f/k/a Lancaster Fine Foods ("LFF" and collectively with EPO, "Plaintiffs") claim

Defendants Corona-Orange Foods Intermediate Holdings LLC ("Defendant") breached its contractual obligation to contribute capital towards improvements for LFF's facilities.[1]

Plaintiffs filed their first complaint (the "Complaint") on May 5, 2023, asserting one count for breach of contract against Corona.[2] On July 6, 2023, Defendant moved to dismiss the Complaint.[3] On August 7, 2023, the Court entered a stipulation and order that stayed the proceedings pending mediation.[4] The parties were not able to resolve the matter during mediation.[5]

On October 25, 2023, Plaintiffs filed an amended complaint (the "Amended Complaint").[6] The Amended Complaint asserted two claims—breach of contract and fraud—and added Wind Point Advisors LLC ("WPA") as a defendant.[7] On November 21, 2023, Defendants then filed their Motion to Dismiss Amended Complaint and Defendants' Opening Brief in Support of Their Motion to Dismiss the Amended Complaint (collectively, the "Motion to Dismiss").[8] On January 25, 2024, Plaintiffs submitted their Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Opposition.")[9] Defendants filed their Defendants' Reply Brief in Further Support of Their Motion to Dismiss the Amended Complaint on February 23, 2024.[10]

On March 14, 2024, the Court held a hearing on the Motion to Dismiss.[11] After hearing from the parties, the Court took the matter under advisement. On April 17, 2024, the Court

---

[1] Amended Complaint (hereinafter "Am. Compl.") p. 1 (D.I. No. 26).
[2] Complaint (D.I. No. 1).
[3] D.I. No. 13.
[4] D.I. No. 20.
[5] *See* D.I. No. 24.
[6] Am. Compl.
[7] *Id.*
[8] D.I. No. 32.
[9] D.I. No. 38.
[10] D.I. No. 41.
[11] D.I. No. 47.

issued an opinion that granted, in part, and denied, in part, the Motion as to Count I of the Complaint.[12] In addition, the Court granted the Motion as to Count II of the Complaint. The Court dismissed WPA as a party.[13]

Subsequently, Plaintiffs filed Plaintiffs' Plaintiffs' Motion for Leave to File Second Amended Complaint (the "Motion") on September 4, 2024. The Motion seeks leave to file a Second Amended Complaint (attached as an exhibit to the Motion) which would add a claim for a breach of the implied covenant of good faith and fair dealing (new "Count II") and a new claim for fraud (new "Count III").

For the reasons set forth below, the Court will **GRANT** the Motion, in part, and **DENY** the Motion, in part. The Court will allow the filing of the Second Amended Complaint as to Counts I and III. However, the Court finds that Count II fails to state a claim for relief and would, therefore, be a futile claim.

## II.    RELEVANT FACTS[14]

### A. THE PARTIES

EPO and LFF are organized under Pennsylvania law with their principal places of business in Lancaster County, Pennsylvania.[15] At one time, LFF owned 100% of EPO.[16] Before its sale to Corona, LFF "focused on producing contract formulation specialty foods such as sauces, dressings, and condiments."[17] By 2020, LFF, "a family-owned business established in 2008 by Michael Thompson, its President," was generating millions of dollars in annual

---

[12] *Earth Pride Organics, LLC v. Corona-Orange Foods Intermediate Holdings, LLC*, 2024 WL 1905384 (Del. Super. Apr. 17, 2024).

[13] *Id.*

[14] The Court incorporates by reference the background facts set out in *Earth Pride Organics, LLC*, 2024 WL 1905384, at *1-4.

[15] Mot., Ex. 2, Redline of Second Amendment Complaint ("SAC") ¶ 1.

[16] *Id.*

[17] *Id.* LTG's customers included Auntie Anne's, Casablanca Foods, Starbucks, Robert Rothchild Foods, Mike's Hot Honey, and Bonnie Jams. *Id.*

3

revenue.[18]  Because of LFF's success, numerous prospective purchasers contacted Mr. Thompson, and others at LFF, about buying the company.[19]

Corona is organized under Delaware law, with their principal places of business in Chicago, Illinois.[20]  LFF became a part of Stir Foods after Corona acquired it.[21]

## B. THE PURCHASE AGREEMENT

On February 17, 2021, the parties entered into the Membership Interest Purchase Agreement ("Purchase Agreement") for Plaintiffs to sell their business, LFF, to Defendant.[22]  The Purchase Agreement allowed for LFF to transfer 100% interest in its business to Defendant through the Stir Foods Lancaster, LLC entity.[23]  As consideration, Plaintiffs were to receive a post-closing earnout.[24]  The earnout payment was to equal four times the amount of Defendant's "earnings before interest, taxes, depreciation, and amortization" ("EBITDA") if Defendant exceeded their target EBITDA of $1.8 million.[25]

The Purchase Agreement's terms govern how parties should handle earnout disputes as well as what disputes go to an independent accountant.  Relevant provisions of the Purchase Agreement to the Motion include Purchase Agreement Sections 3.8(b), Section 3.8(d) and Section 10.13.

Purchase Agreement Section 3.8(b) provides:

> Within sixty (60) days after the Earnout Calculation Date, the Purchaser shall deliver to Representative a statement setting forth its calculation of Earnout EBITDA ("the Earnout Statement"). The Earnout Statement shall become final and binding upon the parties on the thirtieth (30th) day following the date on which the

---

[18] *Id.* at ¶ 8.
[19] *Id.* at ¶ 9.
[20] *Id.* at ¶ 3-4.
[21] *Id.*
[22] Plaintiffs' Motion for Leave to File Second Amended Complaint ("Mot.") ¶ 2.
[23] Initial Complaint ("Compl.") ¶ 15.
[24] *Id.*
[25] Defendant's Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint ("Opp."), Ex. A., Membership Interest Purchase Agreement ("Purchase Agreement") § 3.8(a).

4

Earnout Statement is delivered to Representative, unless Representative delivers written notice of its disagreement with the Earnout Statement (a "Notice of Earnout Disagreement") to the Purchaser prior to such date . . . *If at the end of such fourteen (14)-day period Representative and the Purchaser have not resolved in writing the matters specified in the Notice of Disagreement, either Representative or the Purchaser may submit such dispute to the Accounting Firm*, and such dispute shall thereafter be resolved in accordance with the procedures set forth in Section 3.4(c) herein.[26]

Purchase Agreement Section 3.8(d) states:

The Seller Parties acknowledge and agree that the achievement of the Earnout Payment is subject to various factors, many of which will be outside the control of the Purchaser and its Affiliates, and that there are no assurances as the amount of the Earnout Payment.[27]

Finally, Purchase Agreement Section 10.13 provides:

Any Action arising out of or relating to this Agreement or the transactions contemplated hereby may only be instituted in any state or federal court in the State of Delaware and each party waives any objection which such party may now or hereafter have to the laying of the venue of any such Action, and irrevocably submits to the exclusive jurisdiction of any such court in any such Action.[28]

On September 28, 2020, Milton Lui, CEO of Stir Foods, sent Mr. Thompson an email with attachments (the "Email") expressing WPA's interest in growing LFF's facility in Lancaster, Pennsylvania.[29] Mr. Lui stated that, "[t]o support the foundation already in place, we will bring Cap Ex investment, operating experience, and customer relationships."[30] The Email provided that Stir Foods had the "[b]alance sheet / cash to support growth through continued investment," "broad manufacturing and packaging capabilities," a "diverse customer base," a "[s]easoned management team," and had "successfully brought operations, engineering, sourcing, logistics, and quality expertise to execute against new opportunities."[31]

---

[26] Purchase Agreement § 3.8(b) (emphasis added).
[27] *Id*. § 3.8(d).
[28] *Id*. § 10.13.
[29] SAC at ¶ 11.
[30] *Id*.
[31] *Id*.

On October 5, 2020, Mr. Lawler, sent an email with a Letter of Intent ("LOI") attached.[32]

Mr. Lawler's email stated:

> Milt is looking forward to spending time in the near term with your team. In addition, we are prepared to commit all necessary R&D resources and align on the necessary capital for next year. To be clear we are prepared to spend the $1.5-$2M of capex for growth in 2021.[33]

The LOI included the following language: "we will commit to investing in the Lancaster facility and plan to invest $2 million in 2021 to support growth."[34]  The LOI also expressed WPA's interest in LFF's management team; expressing:

> We have been impressed with Lancaster and look forward to working with the full management team. We regard our relationship with the entire management team to be a partnership and look forward to partnering together on the Company's next stage of growth.[35]

Plaintiffs contend that it was important that LFF continued to "flourish and that its leadership team remain intact."[36]  Relying on the Email and the LOI, Plaintiffs agreed to sell their business to Stir Foods.[37]

## C. ADDITIONAL FACTS IN THE SECOND AMENDED COMPLAINT

Plaintiffs allege additional facts in the Second Amended Complaint to support Count II and Count III.

On Count III, the Fraud claim, Plaintiffs allege a statement made by Defendant's CFO, Pablo Gallo, to Mr. Thompson, the Plaintiffs' President.[38]  Under the Purchase Agreement, lease reimbursements of approximately $40,000 would go towards EBITDA.  During the earnout period, this would add up to $480,000 and multiplied by four, per the earnout calculation

---

[32] *Id.* at ¶ 13.
[33] *Earth Pride Organics, LLC*, 2024 WL 1905384, at *2.
[34] *Id.*
[35] *Id.*
[36] Am Compl. ¶ 10.
[37] *Id.* ¶ 15.
[38] SAC ¶ 34.

agreement, would exceed the EBITDA Target.[39]  In May 2021, Defendant was negotiating a lease with a third party.[40]  Entering a new lease agreement would wipe out the lease reimbursements and reduce Plaintiffs' earnout payment.[41]

Plaintiffs contend their consent was required for Defendant to enter the new lease and Mr. Thompson objected to the lease agreement.[42]  Plaintiffs argue that to induce Mr. Thompson's, and thus Plaintiffs' consent, Pablo Gallo insured $500,000 in tenant improvement monies would take the place of the lost $480,000 in the EBITDA.[43]  The Purchase Agreement required the earnout to be "calculated in accordance with [Defendant's] interpretation of GAAP."[44]  The tenant improvement monies were not recognized as EBITDA.[45]  Plaintiffs assert that they lost $1.9 million in earnout payment because of this.[46]  Plaintiffs claim that Pablo Gallo purposefully provided Mr. Thompson, on behalf of Plaintiffs, with a false interpretation of GAAP in order to obtain Plaintiffs' consent.[47]

Plaintiffs present three specific situations to provide a factual basis for Count II. Plaintiffs allege there were two shutdowns of the LFF facility that were both unnecessary.[48]  The first was a two-week shutdown for cleaning due to a potential contamination of a harmless strain of yeast.[49]  Plaintiffs assert that the type of testing Defendant conducted was not ordinary custom and practice, and that the testing had never been done at Defendant's other facilities.[50]

---

[39] *Id.* ¶ 33.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.* ¶ 34.
[44] *Id.* ¶ 35.  *See* Purchase Agreement §1.1, Definition of "Earnout EBITDA."
[45] *Id.* ¶ 36.
[46] *Id.* ¶ 34.
[47] *Id.* ¶ 35.
[48] *Id.* ¶ 24.
[49] *Id.* ¶ 25.
[50] *Id.*

According to Plaintiffs, custom and practice dictates that a retest should confirm the contamination, and, if it does, only the affected machinery should be shutdown.[51]  When Defendant conducted a retest, at the urging of Plaintiffs, it came back clear of the harmless strain of yeast.  Despite this, Defendant kept the LFF facility closed for a full two weeks for cleaning.[52]  The Defendant Senior Vice President of Operations informed Mr. Thompson, "laughing" that the shutdown would impact Plaintiffs' earnout.[53]  The second shutdown was also for two weeks.[54]  This time, the shutdown was to install a new piece of equipment.  Plaintiffs contend the new machinery was unnecessary for the LFF facility because it was for a product that the facility did not, and was not planning on, producing.[55]  Plaintiffs further contend the equipment could have been installed in only two days.[56]

Plaintiffs also allege that Defendant forced discounted production at the LFF facility.[57]  Defendant's West Coast facility was facing a contamination, impacting production for Defendant's largest customer.[58]  Defendant required production for the customer at a discounted price, resulting in a loss at the LFF facility.[59]  Plaintiffs had never made this product at the LFF facility and assert this loss impacted their earnout calculation by four multiplied for each $1 of profit lost.[60]

---

[51] *Id.*
[52] *Id.* ¶ 26.
[53] *Id.* ¶ 25.
[54] *Id.* ¶ 27.
[55] *Id.*
[56] *Id.*
[57] *Id.* ¶ 29.
[58] *Id.* ¶ 30.
[59] *Id.* ¶ 31.
[60] *Id.*

## III.   PARTIES' CONTENTIONS

### A. THE MOTION

#### 1.   *Prejudice and Undue Delay*

Plaintiffs argue the Second Amended Complaint does not prejudice Defendant nor delay litigation.[61]  First, Plaintiffs assert the parties are not far enough into discovery for the Second Amended Complaint to burden Defendant with added discovery.[62]  The parties have not begun depositions nor expert discovery.[63]  The parties recently started fact discovery, and there is ample time before trial set for July 2025.[64]  Second, Plaintiffs maintain that granting the Second Amended Complaint promotes efficiency and judicial economy.[65]  Plaintiffs contend the added claims relate to the existing claims argument that "Defendant's actions depriv[ed] Plaintiffs of their full earnout."[66]  Plaintiffs argue the added claims do not require discovery outside the realm of what Defendant has already discovered or plan to discover.[67]  Finally, Plaintiffs claim they filed the Second Amended Complaint without delay because "recently identified" facts suggested these claims were better resolved by the Court than the accountant.[68]

#### 2.   *Added Claims*

##### a.   **Fraud (Count III)**

Plaintiffs contend Defendant knowingly misrepresented their interpretation of the GAAP in terms of the new lease agreement's impact on Earnout Calculation.[69]  Defendant's new lease agreement with a third party extinguished the $40,000/month lease reimbursement going towards

---

[61] *See* Mot. at 9-10.
[62] *Id.* at 9.
[63] *Id.*
[64] *Id.*
[65] *Id.* at 10.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.* at 6.

LFF's EBITDA.[70]  Plaintiffs objected to the new lease agreement because of this.[71]  However,

Plaintiffs assert Defendant assured, despite the reimbursements going away, $500,000 in tenant

improvement monies would go towards the EBITA instead.[72]  Thus, more money would be

accounted for in LFF's EBITDA.  Plaintiffs allege the tenant improvement monies were never

accounted for in the EBITDA, and never went towards the total Earnout Calculation.[73]

### b.  Breach of the Implied Covenant (Count II)

Plaintiffs allege Defendant breached the implied contractual obligation that

"Defendants [are] prohibited from engaging in arbitrary and unreasonable conduct that was

contrary to the purpose of the [Purchase Agreement] to deprive Plaintiffs of the fruits of their

bargain and acting in bad faith to reduce or limit Plaintiff's earnout money."[74]  Plaintiffs contend

Defendant breached this obligation by: (1) unnecessarily shutting down the LFF facility twice

and (2) causing the LFF facility to lose profit by forcing the facility to provide discounted

products to Defendant's customers after its West Coast facility faced contamination.[75]

## B.  THE OPPOSITION

### 1.  Jurisdiction

Defendant argues the Court does not have jurisdiction over this case because

Plaintiffs' issue falls under Purchase Agreement Section 3.8.[76]  Section 3.8(b) requires an

independent accountant to resolve Earnout Calculation disputes.[77]  Defendant contends each of

Plaintiffs' disputes pertain to the Earnout Calculation.[78]  Therefore, it is not appropriate for the

---

[70] *Id.*
[71] *Id.*
[72] *Id.* at 7.
[73] *Id.* at 7-8.
[74] *Id.* at 8.
[75] *Id.* at 8-9.
[76] Opp. at 2.
[77] *Id.* at 2-3.
[78] *Id.* at 3.

10

added claims to be before the Court, but instead should be resolved by the independent accountant.[79]

### 2. *Prejudice and Undue Delay*

Defendant maintains that granting the Second Amended Complaint would cause further delays and be prejudicial to Defendant by expanding discovery requirements. Defendant argues Plaintiffs included the added claims in the Notice of Earnout Disagreement but waited two years, without valid explanation, to bring the claims to Court.[80] Defendant asserts Plaintiffs will certainly ask for expanded discovery because the added claims have nothing to do with the facts of the existing claims.[81] The facts surrounding the added claims have to do with "plant shutdowns and customer discount and whether they were done for the alleged purpose of suppressing EBITDA,"[82] while the existing claim is "regarding Corona not investing $2 million in capital expenditures by December 31, 2021."[83] Accordingly, Defendant contends the expanded discovery "would jeopardize the July 21, 2025 trial date."[84]

### 3. *Added Claims*

Defendant finds it cannot "properly argue futility" in 10 pages and requests under Superior Court Rule 107(h) "to the extent the Court is considering granting Plaintiff's Motion . . . to file a regular 8,000-word Opposition brief."[85] This request is denied. The Court will decide the issue of futility without further briefing.

---

[79] *Id.*
[80] *Id.* at 5.
[81] *Id.* at 6.
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.* at 7 n.4. *See* Super. Ct. Civ. R. 107(h) "Without leave of Court, an opening or answering brief shall not exceed 8,000 words and no reply brief shall exceed 5,500 words, exclusive of appendix."

11

### a. Fraud

Defendant asserts Plaintiffs' fraud claim is futile on the basis they cannot plead justifiable reliance with particularity.[86] Defendant argues Plaintiffs' consent was never required to enter the new lease agreement.[87] Therefore, Plaintiffs could not have relied on the alleged misrepresentation.[88] Defendant contends the fraud claim is a repackaging of their breach of contract claim previously dismissed by the Court.[89]

### b. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant argues the breach of implied covenant claim is futile because the Purchase Agreement anticipated the events that Plaintiffs now allege as breach.[90] Defendant contends that it did not owe the alleged implied contractual obligation because the Purchase Agreement was not silent as the unexpected events impacting the Earnout Payment.[91] Defendant relies on the statement that the Earnout Payment is "subject to various factors, many of which will be outside the control of the Purchaser and its Affiliates, and that there are no assurances as to the amount of Earnout Payment."[92] Defendant argues the Purchase Agreement contemplates the events that EPO points to as examples of Corona's alleged breach.[93] Further, Defendant contends that Plaintiffs did not negotiate the Purchase Agreement to include their rights to veto Defendant's actions.[94] Therefore, Defendant argues, there are not any "unanticipated gaps in the parties' agreement."[95]

---

[86] Opp. at 8.
[87] *Id.*
[88] *Id.* at 9.
[89] *Id. See* Court's Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Plaintiff's Amended Complaint, dated April 17, 2024.
[90] Opp. at 9.
[91] *Id.*
[92] *Id.* at 9-10 (citing Purchase Agreement, § 3.8(d)).
[93] *Id.*at 10.
[94] *Id.*
[95] *Id.*

## IV.    STANDARDS OF REVIEW

### A.  MOTION FOR LEAVE TO AMEND

Civil Rule 15(a) provides that for an amendment to the pleadings, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party . . . and leave shall be freely given when justice so requires."[96]  Leave to amend pleadings "should be freely given unless there is evidence of undue delay bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, prejudice, futility, or the like."[97]  "The Court may also consider the proposed amendment's impact on a scheduled trial date."[98]  A motion for leave to amend is futile "where the amended complaint would be subject to dismissal under Rule 12(b)(6) for failure to state a claim,"[99] and where a claim "could not survive a Rule 12(b)(1) motion to dismiss."[100]

### B.  MOTION TO DISMISS

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[101]  However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[102]

---

[96] Super. Ct. Civ. R. 15(a).
[97] *Pettit v. Counter Life Homes, Inc.*, 2006 WL 2811707, at *1 (Del. Super. Oct. 3, 2006).
[98] *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 149 A.2d 242, 246 (Del. Super. 2016).
[99] *Clark v. State Farm. Mut. Auto. Ins. Co.*, 2006 WL 2811707, at *1 (Del. Super. Oct. 3, 2006).
[100] *Cummings v. Estate of Lewis*, 2013 WL 979417, at *9 (Del. Ch. Mar. 14, 2013).
[101] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad.,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[102] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

## C. FRAUD

Civil Rule 9(b) requires plaintiffs to plead fraud with particularity.[103] "The purpose of [Superior Court Civil Rule 9(b)] is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated."[104] Pleading fraud with particularity requires "time, place, contends of the alleged fraud . . . as well as the individual accused of committing the fraud."[105] "Malice, intent, knowledge and other condition of mind of a person may be averred generally."[106] "At the motion to dismiss stage, a plaintiff need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false."[107]

## V. DISCUSSION

The Court will **GRANT**, in part, the Motion because: (i) the Court has jurisdiction to hear the parties' legal disputes under Purchase Agreement Section 10.13; (ii) the Court finds that Plaintiffs did not unduly delay the filing of the Second Amended Complaint nor does its filing prejudice Defendant, and (iii) the Court does not find Count III is futile as plead. The Court will **DENY**, in part, the Motion because Count II is futile as plead.

### A. THE COURT HAS JURISDICTION OVER COUNTS II AND III OF THE SECOND AMENDED COMPLAINT.

"[T]here is a strong presumption in favor of arbitration agreements in Delaware Courts."[108] "The Court will dismiss for lack of subject matter jurisdiction if the dispute, on its

---

[103] Super. Ct. Civ. R. 9(b).
[104] *Uppal v. Waters*, 2016 WL 4211774, at *2 (Del. Super. Aug. 9, 2016) (quoting *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[105] *Uppal*, 2016 WL 4211774, at *2 (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Feb. 12, 2012)).
[106] Super. Ct. Civ. R. 9(b).
[107] *Sofregen Med. Inc. v. Allergan Sales, LLC*, 2021 WL 1400071, at *2 (Del. Super. Apr. 1, 2021).
[108] *Elia v. Hertrich Family of Auto. Dealers*, 2013 WL 6606054, at *3 (Del. Super. Dec. 13, 2013), *aff'd,* 103 A.3d 514 (Del. 2014).

14

face, falls within the arbitration clause of the contract."[109]  A narrow arbitration clause limits disputes sent to arbitration to those identified.[110]  When interpreting a narrow arbitration clause, the question before the Court is whether the legal claim's cause of action "directly relates to the right in the contract."[111]  If the issue raised falls outside the scope of a narrow arbitration clause, then it is for the court to evaluate.[112]  Disputes pertaining to contract interpretation are legal claims that should be brought before the court.[113]

The Purchase Agreement's arbitration clause applies to the "Earnout Statement," which is defined as "a statement setting forth its calculation of Earnout EBITDA."[114]  The Purchase Agreement gives the Accounting Firm an item-valuing role.[115]  According to this clause, the parties submit Earnout Statement disputes to the Accounting Firm.[116]  This is a narrow arbitration clause assigning the specific disagreement over Earnout EBITDA calculation to an independent accountant.  The parties disagree over what disputes fall into this narrow scope.  Defendant characterizes the issue as a "modification to Corona's EBITDA for purposes of the

---

[109]*Specialty Dx Holdings, LLC v. Lab. Corp. of American Holdings*, 2020 WL 5088077, at *5 (Jan. 31, 2020).
[110] *Id.*at *6.
[111] *Id.*at *5.
[112] *Compare Specialty Dx Holdings*, 2020 WL 5088077, at *6-7 (holding narrow arbitration clause governed Earnout Calculation disputes, therefore the independent accountant had jurisdiction over parties' "differing calculations of revenue."), *with Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 930-31 (Del. 2017) (holding Defendant's disputes did not fall under the arbitration clause's narrow scope governing specific disputes enumerated by the parties in the Purchase Agreement.)
[113] *See Fortis Advisors LLC v. Dematic Corp.*, 2022 WL 18359410 (Del. Super. Dec. 29, 2022) (holding the Court has jurisdiction over the dispute as opposed to an independent accountant because the issue raised to the Court was about contract interpretations and not calculations); *Windy City Investments Holdings, LLC v. Teachers Ins. And Annuity Assoc. of America*, 2019 WL 2339932, at *9 (Del. Ch. 2019) (holding the Court has jurisdiction to evaluate claims asking for legal guidance and not to determine "a specific calculated amount or figure in the Earn-Out amount.")
[114] Purchase Agreement § 3.8(b).
[115] Purchase Agreement § 3.4(c) "The Accounting Firm may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value of such item claimed by either Party…"
[116] *Id.*

earnout calculation."[117] Plaintiffs state their claims "entail factual discovery and adjudication of issues of legal liability."[118]

The Court finds that Counts II and III, as plead, do not fall under the arbitration clause. Counts II and III are asking the Court to evaluate and determine liability for actions Defendant took subsequent to the Purchase Agreement. It is true that these purported actions impacted the Earnout Statement calculation. However, Plaintiffs are not asking the Court take on the role of the independent accountant and determine value assignments to Defendant's EBITDA. Therefore, the Court find that Purchase Agreement Section 10.13 of the Purchase Agreement does not apply, and the Court has jurisdiction over Counts II and III.

### B. THERE IS NO UNDUE DELAY OR PREJUDICE TO DEFENDANT.

Courts are "reluctant to allow amendments which substantially alter the nature of the claim or which allege new claim[s]."[119] Amendments "must not substantially change the cause of action or defense or introduce a different claim or defense."[120] "[T]he law is also clear that '[t]he Court may allow amendment of pleadings over a party's objection when that party fails to show prejudice would result from such an amendment.'"[121] In *Brighthouse Life Insurance Company v. Geronta Funding*, the Court found the nonmoving party was prejudiced because a claim added after discovery closed changed their defense approach entirely.[122] The Court also found the defendants in *Martinez v. E.I. DuPont de Nemours and Co., Inc.* were prejudiced.[123] In

---

[117] Opp. at 3.
[118] Mot. at 3.
[119] *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198325, at *4 (Del. Super. 2019).
[120] *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*, 1990 WL 35299, at *4 (Del. Super. Mar. 27, 1990) (quoting *E.K. Geyser, Co. v. Blue Rock Shopping Centr.*, 229 A.2d 499 (Del. Super. 1967).
[121] *Brighthouse Life Ins. Co.*, 2019 WL 8198325, at *5 (quoting *Miglino v. Adkins*, 1991 WL 269924 (Del. Super. Dec. 11, 1991)).
[122] 2019 WL 8198325, at *5.
[123] *Martinez v. E.I. DuPont de Nemours and Co., Inc.*, 2012 WL 4479164, (Del. Super. 2012)

16

that case, the amendments required additional briefing, expert affidavits, and additional hearings on Argentine law.[124]

A court will generally allow a party to amend where delay was minimal or justified.[125] However, "where a movant has no valid explanation for this delay, and the facts upon which the proposed amendments are based were known long in advance of the motion, it is entirely proper for the Court, in its discretion, to deny the motion."[126] In *Weinstein v. Luxeyard, Inc.*, the motion to amend was denied because defendant waited two years after filing the initial answer and past the discovery deadline to file the amended answer.[127] In addition to the delay, the amended answer denied most responses admitted prior and asserted eleven new affirmative defenses.[128] In contrast, the motion was granted in *Tomczak v. Morton Thiokol, Inc.* because the moving party's delay was minimal and justified.[129] This finding was due to the amount of production the moving party had to go through from expedited discovery.[130]

The facts here contrast with what the Court has held to be prejudicial or causing undue delay to a nonmoving party. While the Plaintiffs are adding two new claims in the Second Amended Complaint, Counts II and III stem from the same facts alleged in the original complaint. Further, the disputes were brought up when the parties were arranging the independent accountant. Plaintiffs do not raise these issues for the first time in the Second Amended Complaint. Moreover, Defendant has known of the alleged facts both prior to the litigation and since Plaintiffs commenced the civil actions. In fact, Defendant addresses, in the

---

[124] *Id.*
[125] *See Weinstein v. Luxeyard, Inc.*, 2020 WL 1492040 (Del. Super. Mar. 23, 2020); *Tomczak v. Morton Thiokol, Inc.*, 1985 WL 21142 (Del. Ch. Oct. 3, 1985).
[126] *Brighthouse Life Ins. Co.*, 2019 WL 8198325, at *5.
[127] 2020 WL 1492040 at *3.
[128] *Id.* at *4.
[129] 1985 WL 21142 at *1-2.
[130] *Id.* at *1.

Opposition, that the added claims were raised in Plaintiffs' Notice of Earnout Disagreement from November 2022.[131] Any delay was due to ongoing communications with Defendant about the independent accountant and what claims would be heard in arbitration versus in this Court. Further, Defendant did not want the motion to amend to run concurrently with arbitration.

Therefore, the Court finds that Plaintiffs did not engage in undue delay. In addition, the Court does not find that Defendant will be prejudiced by the filing of the Second Amended Complaint.

### C. PLAINTIFFS' FRAUD CLAIM IS NOT FUTILE.

"The elements of common-law fraud are (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damages resulted from such reliance."[132] "Where one actively conceals a material fact, such person is liable for damages caused by such conduct."[133]

To satisfy particularity, a plaintiff must "allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[134] Plaintiffs meet this standard when they plead time, place, and content of the fraud as well as identity of those committing fraud with particularity.[135] Plaintiffs must also plead the party's purpose or intent behind the alleged fraud.[136]

---

[131] Opp. at 1.
[132] *Matrix Parent, Inc v. Audax Mgmts. Co., LLC,* 2024 WL 3198380, at *2 (Del. Super. June 27, 2024).
[133] *Id.*
[134] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. Feb. 14, 2006).
[135] *Id.*
[136] *Id.*

In *H-M Wexford LLC v. Encorp, Inc.*, the Court found justifiable reliance based on plaintiff's allegation they relied on defendant's false representation when deciding to engage in an offer.[137] The plaintiffs pointed to the alleged false statements and what those statements induced them to do.[138] The Court held this exactness pled justifiable reliance with particularity.[139] Like that case, Plaintiffs have pled the particular statement and how dependence on that statement led Plaintiffs to consent to the lease agreement.[140]

In the Second Amended Complaint, Plaintiffs plead with particularity that in May 2021, Defendant made a false representation as to how Defendant interprets the GAAP. Plaintiffs assert Defendant knew these representations were false and never intended to follow through on their May 2021 representation to Plaintiffs. Plaintiffs plead justified reliance on Defendant's representation based on the consent they gave to the new lease arrangement.[141]

The parties dispute over whether the lease agreement required Plaintiffs' consent. Plaintiffs allege Mr. Thompson was under the impression that Defendant could not enter the lease agreement without his, and thus the Plaintiffs', consent.[142] Defendant argues its consent was not required and, therefore, there could be no justifiable reliance.[143] If there was no consent required, it is hard to find justifiable reliance. Without needing Plaintiffs' consent, Defendant, no matter what was represented to Plaintiffs, could do what it wanted in terms of the lease agreement. However, a motion to dismiss standard is applicable here. As such, the Court accepts all well-pleaded factual allegations as true. The Court must accept Plaintiffs' allegation

---

[137] 832 A.2d 129, 146-47 (Del. Ch. May 27, 2003).
[138] *Id.* at 146 ("[Plaintiff] has specifically alleged that it relied on the defendants' ostensibly false representations in the Purchase Agreement in deciding to participate in the February 2001 Offering.")
[139] *Id.* at 147.
[140] SAC ¶ 52-58.
[141] *Id.*
[142] *Id.* ¶ 33.
[143] Opp. at 8-9.

that consent was necessary and created a justifiable reliance as true. Further discovery may uncover that consent was unnecessary, and, if that is the case, this claim may be disposed of prior to trial.

Defendant's bootstrap argument is not applicable. This is not the same argument that led to dismissal of the fraud claim in the Complaint. That fraud claim was based on the factual allegations underlying the breach of contract claim as well.[144] Those allegations pertained to Defendant's failure to invest $2 million in the company as required by Purchase Agreement Section 7.8.[145] Count III, as described above, relies on the factual allegation that Defendant represented a false interpretation of GAAP to Plaintiffs. As such, Count III is not a bootstrapped breach of contract claim.

Therefore, the Court should find that Plaintiffs' Fraud claim is not futile and should allow the amendment.

### D. THE COURT FINDS THAT COUNT II, AS PLED, IS FUTILE.

"[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith. Consequently, in every contract there exists an implied covenant of good faith and fair dealing."[146] "To prove a breach of an implied covenant, the claimant must demonstrate by a preponderance of the evidence (i) specific, implied contractual obligation; (ii) breach of that obligation; and (iii) resulting damage."[147]

The covenant of good faith and fair dealing is a gap-filling mechanism to handle issues "neither party anticipated."[148] While the implied covenant "is inherent in all contracts," its role

---

[144] *See* Court's Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Plaintiff's Amended Complaint, dated April 17, 2024.
[145] *Id.*
[146] *Amirsaleh v. Bd. Of Trade of City of N. Y., Inc.*, 2008 WL 4182998 (Del. Ch. Sept. 11, 2008).
[147] *Ahmed Al Balooshi v. GVP Global Corp*, 2022 WL 576819, at *9 (Del. Super. Feb, 25, 2022).
[148] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

is limited to ensure the parties do not "frustrat[e] the fruits of the bargain."[149]   The covenant

does not allow for judicial rewriting of contracts, "[p]arties have a right to enter into good and

bad contracts, the law enforces both."[150]  Accordingly, "[i]t does not apply when the contract

addresses the conduct at issue."[151]   For a party to claim the covenant has been breached, they

must identify some contractual gap such that the covenant applies.[152]  Additionally, an implied

covenant claim fails if it is duplicative.[153]

In *Nemec v. Shrader*, the Supreme Court stated a breach of implied covenant claim is not

"an equitable remedy for rebalancing economic interests after events that could have been

anticipated, but were not, that later adversely affected one party to a contract."[154]  In this case,

the Court found the retired stockholder's claim to be a "post contracting equitable amendment"

to shift "economic benefits" to him.[155]  The stockholder claimed the company's exercise of its

redemption right at the time it did was not foreseeable at the time of contracting; thus, implying

that the stockholder would have negotiated terms differently.[156]  The Court held this argument

was not justified.[157]  The stockholder was in a position to expect the company may someday be

purchased by an acquirer.[158]

Plaintiffs assert the Purchase Agreement indicates the implied covenant to refrain from

"arbitrary and unreasonable conduct" that is "contrary to the purpose of the agreement" for the

---

[149] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1009, 1116 (Del. 2022).
[150] *Nemec*, 991 A.2d at 1126.
[151] *Nationalwide Emerging Managers, LLC v. Northpointe Holdings*, LLC, 112 A.3d 878, 896 (Del. 2015).
[152] *Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. Feb. 1, 2018), *aff'd sub nom.*, *Miller v. HPC Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018).
[153] *Reardon v. CANarchy Holdco Corp.*, 2021 WL 2287468, at *3 (Del. Super. June 4, 2021).
[154] *Nemec*, 991 A.2d at 1128.
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.*

purpose of "reduc[ing] or limit[ing] Plaintiff's earnout money."[159]  In the Second Amended Complaint, Plaintiffs point to two scenarios in the breach of implied covenant allegations: (i) two LFF facility shutdowns and (ii) forced production of discounted products.[160]  The facts alleged suggest these events were not outside of Defendant's control, but rather were chosen by Defendant to be handled adverse to custom norm.

However, as in *Nemec*, Defendant's actions implicating Plaintiffs' earnout payment were foreseeable at the time the parties entered into the Purchase Agreement.  Plaintiffs could have bargained for prohibitions of such acts.  Alternatively, Plaintiffs could have negotiated for veto rights as to these acts.  Plaintiffs did not.  Based on the facts alleged, Plaintiffs are seeking a "post contracting equitable amendment" to increase the potential for an earnout payment.

Granting a motion to dismiss is appropriate when the alleging party cannot plead actions indicating breach.[161]  Count II is evaluated under a Rule 12(b)(6) standard; therefore, the Court is tasked with determining whether Plaintiffs' allegations are sufficient to state a claim for breach of implied covenant.  The Court finds that Plaintiffs have failed to demonstrate that the Purchase Agreement contains a gap in its provisions such that the implied covenant applies.  Accordingly, the Court finds that Count II is futile.  The Second Amended Complaint can move forward but only on Counts I and III.

---

[159] SAC ¶ 17.
[160] SAC, at ¶ 23-37.
[161] *JPMorgan Chase & Co. v. American Century Cos., Inc.*, 2012 WL 1524981, at *8 (Del. Ch. Apr. 26, 2012) (denying motion to dismiss because plaintiffs showed that defendant's "inaccurately low valuation" disclosure to plaintiffs breached defendant's implied obligation under the parties' Agreement.).

## VI. CONCLUSION

For the reasons stated above, the Motion is **GRANTED** as to Count III and **DENIED** as to Count II.

**IT IS SO ORDERED.**

Dated: December 20, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress

23