# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TAMER HASSANEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2025-0299-DH |
| NTO FUND I, LLC, NICHOLA | ) | |
| ELIOVITS, and DERMBIONT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPORT

Report:  January 27, 2026
Date Submitted:  December 18, 2025

David E. Wilks, D. Charles Vavala, and Jordan Hicks, WILKS LAW, LLC, Wilmington, Delaware; *Attorneys for Plaintiff Tamar Hassanein*.

Elizabeth S. Fenton and Brittany M. Giusini; *Attorneys for Defendants NTO Fund I, LLC, Nichola Eliovits, and Dermbiont, Inc*.

**HUME, IV, M.**

These parties appear before the Court in a dispute over a regrettably drafted contract. Two business associates created an LLC to invest in a third party. The LLC Operating Agreement established that one member would lend money to the LLC through a capital contribution. The second member would make a capital contribution to the LLC within six months or annual interest would begin to accrue against the LLC. While the lending party made his initial capital contribution, the second member failed to meet his part of the bargin. But the parties' poorly drafted contract provided the annual interest as the only recourse for failing to make the capital contribution that would repay the initial loan. The parties elected not to include a default date or any structure for repayment of the principal. The parties must live with the result of their agreement, and I grant the Defendants' Motion to Dismiss. This is my final report.[1]

---

[1] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2025-0299-DH ("D.I."). At the time of this ruling, only the draft transcript has been prepared and citations to it refer to the rough copy of the transcript ("Draft Tr."), D.I. 25. Citations in the form of "Compl." refer to Plaintiff's Verified Amended Complaint, D.I. 13. Citations in the form of "DOB" refer to Defendants' Motion to Dismiss Plaintiff's Amended Verified Complaint, D.I. 17. Citations in the form of "PAB" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss, D.I. 19. Citations in the form of "DRB" refer to Defendant's Reply Brief in Support of Their Motion to Dismiss Plaintiff's Amended Complaint, D.I. 21.

## I.    BACKGROUND

Plaintiff Tamer Hassanein (Hassanein) is a Texas resident.[2] Defendant Nicola Eliovits (Eliovits) is a Massachusetts resident.[3]    Defendant NTO Fund I, LLC (NTO) is a Delaware LLC founded on or about August 16, 2021.[4]  Defendant Dermbiont, Inc. (DBI) is a Delaware corporation.[5]  Hassanein and Eliovits formed NTO to invest in DBI.[6]  Hassanein, Eliovits, and NTO entered into an Operating Agreement ("OA" or "the Agreement") on or about September 20, 2021 that authorized NTO to issue 300,000 Class A Units to Eliovits and 300,000 Class B Units to Hassanein.[7]  The Class B Unit Member made an initial $1,924,417.78 capital contribution ("the Class B Loans") under the Agreement.[8]  The Class A Unit Member was to make an initial capital contribution equal to the amount to repay the

---

[2] Compl. ¶ 1.  The following facts derive from the Plaintiff's initial complaint, and all well-pleaded facts are assumed to be true for the purposes of this Motion to Dismiss.  *See In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993).

[3] *Id.*, ¶ 2.

[4] *Id.*, ¶ 3

[5] *Id.*, ¶ 4.  Eliovits, NTO, and DBI are collectively referred to as "Defendants."

[6] *Id.*, ¶¶ 11–13.

[7] *Id.*, ¶¶ 13–14.  The Operating Agreement ("OA") was included as Exhibit A to the Amended Verified Complaint.

[8] OA § 3.1(e)(ii).

Class B Loans in full within six months of the initial capital contribution (the Class B Maturity Date").[9] The Agreement provided that:

> [I]f the Company does not repay the Class B Loans in full on or prior to the Class B Loans Maturity Date, then simple interest at a rate of six percent (6%) per annum shall accrue and be payable on the unpaid outstanding amount of the Class B Loans, which amount shall accrue from the first date that the Class B Loans were made, and which interest shall be payable every six months in arrears, with the first interest payment due and payable on the Class B Loans Maturity Date.[10]

As the Class B Unit Member, Hassanein made an initial $1,924,417.78 capital contribution to NTO on or about September 21, 2021.[11] Eliovits, who was manager of NTO, directed Hassanein to send the Class B Units's capital contribution directly to DBI.[12] The Class B Maturity Date was March 21, 2022. Eliovits, as Class A Unit Member, did not make a full capital contribution by the Class B Loan Maturity Date.[13] Interest on the Class B Loans began accruing at 6% per annum.[14] Hassanein sent a demand letter to NTO on March 9, 2025 demanding that NTO repay the Class

---

[9] *Id.*, § 3.1(d)(ii).

[10] *Id.*, § 3.1(e)(ii)

[11] Compl. ¶ 18

[12] *Id.*, ¶¶ 12, 19.

[13] *Id.*, ¶¶ 23–24 (describing Eliovits's capital contributions as "sporadic and periodic.").

[14] *Id.*, ¶ 23.

B Loan by March 15, 2025.[15]  NTO has not repaid the Class B Loan.[16]  Hassanein filed a Verified Complaint on March 19, 2025.[17]  Defendants filed a Motion to Dismiss on May 14, 2025.[18]  Hassanein filed an Amended Verified Complaint on July 21, 2025.[19]  The Amended Verified Complaint contained four counts—Breach of Contract (Hassanein v. NTO), Breach of Contract (Hassanein v. Eliovits), Breach of 6 *Del. C.* §18-502 (Hassanein v. Eliovits), and Unjust Enrichment (Hassanein v. DBI).[20]  Defendants moved to dismiss the Amended Verified Complaint and filed their Opening Brief on August 20, 2025.[21]  Hassanein filed his Answering Brief on September 19, 2025.[22]  The Defendants filed their Reply Brief on October 6, 2025.[23] The Court heard oral argument on the Motion to Dismiss on December 18, 2025.

## II.    ANALYSIS

The standard for a motion to dismiss is well-settled.  When reviewing a motion to dismiss under Court of Chancery Rule 12(b)(6), Delaware courts "(1) accept all

---

[15] *Id.*, ¶ 26.

[16] *Id.*, ¶ 27.

[17] D.I. 1

[18] D.I. 7.

[19] D.I. 13.

[20] D.I. 13.

[21] D.I. 17.

[22] D.I. 19.

[23] D.I. 21.

well pleaded factual allegations as true, (2) accept even vague allegations as well pleaded if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (internal citations omitted). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable conceivability." *Id.* at 537 (internal citations omitted). Dismissal is appropriate where "the [nonmoving party] would not be entitled to recover under any reasonably conceivable set of circumstances." *AECOM v. SCCI National Holdings, Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sep. 27, 2023) (quoting *Central Mortgage Co.*, 27 A.3d at 535).

Delaware employs a contractarian scheme for LLCs like NTO. The LLC's operating agreement dictates membership terms and the members' corresponding rights and responsibilities. All considerations of an LLC's internal governance commence by examining the LLC agreement. *See In re Coinmint, LLC*, 261 A.3d 867, 889 (Del. Ch. 2021) ("[T]he limited liability company agreement serves as the primary source of rules governing the 'affairs of a limited liability company and the conduct of its business.'") (quoting 6 *Del. C.* § 18-101(9)). Because LLCs are "creatures of contract," the policy of the Delaware LLC Act gives "maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements. 6 *Del. C.* § 18-1101(b); *see Holifield v. XRI Investment*

5

*Holdings LLC*, 304 A.3d 896, 922 (Del. 2023) ("[T]his Court has observed that the approach of the [LLC Act] is 'to provide members with broad discretion in drafting the [limited liability company agreement] and to furnish default provisions when the members' agreement is silent.'") (quoting *Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999)).

### A. Hassanein lacks standing to bring a claim against Eliovits individually.

Eliovits asserts that Hassanein lacks standing to bring a claim against him individually because his responsibility to make capital contributions as Class A Unit Member is to NTO, not Hassanein.[24] Hassanein counters that he has standing to bring suit against Eliovits individually because Eliovits is a signatory to the Agreement.[25] Both sides cite *Vinton v. Grayson* in support of their arguments. 189 A.3d 695 (Del. Super. 2018).

In *Vinton*, four individual members executed an LLC agreement where they agreed to make additional capital contributions in the event the LLC required additional funding. 189 A.3d at 698. Under the LLC agreement, if a member failed to make required additional capital contributions within forty-five days of the first notice, the non-contributing member would automatically transfer fifty percent of

---

[24] DOB at 8–9.

[25] PAB at 12.

the non-contributor's units to the members who made capital contributions. *Id.* at 698–99. If the non-contributing member failed to make capital contributions within 180 days after the first notice, the balance of that member's units would be transferred to the contributing members. *Id.*

Hassanein points me to the Superior Court's mid-decision finding that the plaintiffs had standing to sue defendant as signatories to the agreement.[26] *Id.* at 701 ("Here, *as signatories* to the [LLC Agreement], each of the Member Plaintiffs has standing to sue [another member] for his breach.") (emphasis added). Hassanein argues that the *Vinton* Court made this finding "based solely on language of 6 *Del. C.* §18-502(a)."[27] This is not supported by the *Vinton* Court's conclusion in the case. That conclusion clarified that the LLC agreement imposed personal liability on individual members, thereby permitting suit among the LLC members. The Court held that:

> Because the [LLC] Agreement is properly read to have imposed personal liability upon [the LLC's] individual members for failure to make additional capital contributions for the ongoing venture, [LLC]

---

[26] PAB at 12. Hassanein additionally cites *VH5 Capital LLC v. Rabe* for the proposition that fellow signatories of an operating agreement have standing to sue one another for breach of the agreement. 2023 WL 4305827, at *14 (Del. Ch. June 30, 2023). As in *Vinton*, the *VH5* Court resolved the standing question on factually sensitive grounds, rather than formulating the brightline rule on which Hassanein hopes to rely. *See id.* (holding that Plaintiff has standing to sue fellow signatories because it signed the LLC Agreement despite not making a capital contribution).

[27] PAB at 12.

Plaintiffs have the right to sue [defendant] for breach of contract. *Id.* at 705.

The Superior Court specified that it was the LLC agreement that imposed personal liability. But our facts and operating agreement are different. In *Vinton* there was an express process where members had direct recourse against other members—contributing members would receive the units of non-contributing members upon failure to contribute after a specified period of time. *Id.* at 704–05. No similar provision exists here, and the agreement created no direct liability between members.

> Agreement Section 3.1(e)(ii) sets forth the obligations of the Class B Units:

> The Obligations of the Class B Units are that as the initial Capital Contribution of the Class B Units, the Class B Members must, in aggregate, lend to the Company the sum of $1,924,417.78 (the "Class B Loans"). The Class B Loans shall not accrue interest, and the sole return on the Class B Loans shall be the Rights and Privileges granted to the Class B Units under this Agreement; provided however that, if the Company does not repay the Class B Loans in full on or prior to the Class B Loans Maturity Date, then simple interest at a rate of six percent (6%) per annum shall accrue and be payable on the unpaid outstanding amount of the Class B Loans, which amount shall accrue from the first date that the Class B Loans were made, and which interest shall be payable every six months in arrears, with the first interest payment due and payable on the Class B Loans Maturity Date.

The Class B Member lends the company, NTO, $1,924,417.78. The loan is not made to Eliovits. NTO is responsible for paying back the Class B Member. This includes interest if the loan is not repaid by the Class B Maturity Date.

8

OA section 3.1(d)(ii) sets forth the obligations of the Class A Units:

> The Obligations of the Class A Units are that on or prior to the date that is six months following the date that the Company receives the proceeds of the Class B Loans (the "Class B Loans Maturity Date"), the Class A Members shall make capital contributions to the Company in an amount sufficient to repay in full to the Class B Members the Class B Loans. The Class A Members, in aggregate and on an allocable basis amongst them, shall contribute to the Company as capital contributions any amounts in excess of distributions necessary to repay in full the Class B Loans.

The Class A member is required to make contributions to NTO, not to the Class B member. The parties constructed the Agreement so that the Class A and Class B Members' capital contribution obligations were to NTO. The Agreement calls for NTO to repay the Class B Loan. The Agreement provides for no direct obligation from one Member to another. There is no intention, unlike in *Vinton*, that there would be direct recourse between the members upon failure to make a capital contribution. *See Vinton*, 189 A.3d at 705 ("Because the . . . Agreement is properly read to have imposed personal liability upon . . . individual members for failure to make additional capital contributions . . . [the] Plaintiffs have the right to sue [Defendant] for breach of contract."). Hassanein lacks standing to sue Eliovits directly. Additionally, as I note below, even if Hassanein had standing, his claim for breach of contract against Eliovits and NTO must fail because there is no breach.

9

## B. There is no Breach of Contract

Hassanein alleges breaches of contract against NTO and Eliovits, respectively. A breach of contract claim requires three elements: existence of a contract, breach of an obligation imposed by the contract, and damages. *See VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Courts interpret LLC agreements as they do any other contract. *Holifield v. XRI Investment Holdings LLC*, 304 A.3d 896, 923–24 (Del. 2023) ("[W]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts.") (internal citations omitted).

It is undisputed that the Agreement, a contract, exists between Hassanein, Eliovits, and NTO. Hassanein alleges that the Class B Loan "is due and owing" with respect to both NTO and Eliovits.[28] The relevant provision reads:

> The Obligations of the Class B Units are that as the initial Capital Contribution of the Class B Units, the Class B Members must, in aggregate, lend to the Company the sum of $1,924,417.78 (the "Class B Loans"). The Class B Loans shall not accrue interest, and the sole return on the Class B Loans shall be the Rights and Privileges granted to the Class B Units under this Agreement; provided however that, if the Company does not repay the Class B Loans in full on or prior to the Class B Loans Maturity Date, then simple interest at a rate of six percent (6%) per annum shall accrue and be payable on the unpaid outstanding amount of the Class B Loans, which amount shall accrue from the first date that the Class B Loans were made, and which interest

---

[28] Compl. ¶¶ 35, 46.

shall be payable every six months in arrears, with the first interest payment due and payable on the Class B Loans Maturity Date.[29]

The contract does not provide a due date for Class B Loan repayment. The Agreement contemplates nonpayment of the Class B Loan by the Class B Maturity Date. The recourse the Agreement provides for failure to repay the Class B Loan by the Maturity Date is interest at 6% per annum. The Agreement does not define default on the Class B Loan and does not require repayment of principal by a date certain. Nor does it provide any repayment structure or schedule. The obligation imposed by the contract is payment of annual 6% interest. That interest has been added to the principal. Neither NTO nor Eliovits have breached the contract. Instead, interest continuously accrues for the Class B Loan, according to the parties bargained-for agreement. The contract continues to function as drafted. The parties, as they are allowed, agreed to these provisions however lamentable they may now seem to Hassanein.

1. **Eliovits did not breach 6 *Del. C.* Section 18-502 because the Operating Agreement controls**

Hassanein argues that under 6 Delaware Code Section 18-502(b), he "is also a creditor of the Company who reasonably relied on a member's [Eliovits's]

---

[29] OA § 3.1(e)(ii).

obligation to make a contribution to the Company."[30]  Section 18-502(b) states in pertinent part:

> Unless otherwise provided in a limited liability company agreement, the obligation of a member to make a contribution or return money or other property paid or distributed in violation of this chapter may be compromised only by consent of all the members. Notwithstanding the compromise, a creditor of a limited liability company who extends credit, after the entering into of a limited liability company agreement or an amendment thereto which, in either case, reflects the obligation, and before the amendment thereof to reflect the compromise, may enforce the original obligation to the extent that, in extending credit, the creditor reasonably relied on the obligation of a member to make a contribution or return.

The opening language, "Unless otherwise provided in a limited liability company agreement," subordinates the statute's applicability to the language of the LLC Operating Agreement.  The Agreement governs.  Based upon the Agreement, Hassanein could not reasonably rely upon return of his loan principal on the Class B Loan Maturity Date.  The Agreement provides no default date or payment schedule. The remedy for nonpayment of the Class B Loans by the Class B Maturity Date is 6% annual interest.  The obligation exists but the parties contracted for the

---

[30] AB at 15.  Hassanein alleges that he is a creditor based on the Class B Loan.  However, under Agreement § 10.3, upon liquidation creditors subordinate the Class B Loan's priority.  This indicates intent that the Class B Loan Member not be considered the standard creditor contemplated by 18-502(b).  I also note that Section 10.3 contemplates nonpayment of the Class B Loan by the Class B Maturity Date.

Agreement's framework to implement that obligation. Repayment is delayed, not denied, by the will of the parties.

Defendants argue that Section 3.2 of the Agreement eliminates the obligation. That argument misreads the agreement. Section 3.2 is entitled "Additional Capital Contributions" and reads:

> Except as provided in Section 3(d)(ii), no Member shall be obligated to contribute to the capital of the Company any additional amounts above the initial capital contribution without the consent of the Member. A Member may make additional capital contributions from time to time. Immediately upon receipt of the capital contributions from the Class A Members under Section 3(d)(ii), the Company shall use those amounts to repay to the Class B Members the Class B Loans.

The section's language excludes Section 3(d)(ii), the Class A Units contributions, by reference. The remainder of Section 3.2 addresses additional capital contributions. The final sentence of the excerpted provision rearticulates the planned allocation of capital injections where the Class B Loans remain unpaid. Reading Sections 3(d)(ii) and 3.2 in concert reveals that (1) Class A members must repay the Class B Loans, (2) capital contributions of Class A members first go to repayment of the loans, (3) failure to timely repay the Class B loans results in interest accruing, and (4) the Operating Agreement does not contemplate further additional mandatory capital contributions.

Section 3.3 is entitled "Return of Contributions." This provision states:

13

> A Member is not entitled to the return of any part of its capital contributions, to be paid interest in respect of either its capital account or its capital contributions, or to be paid the fair market value of its Units in connection with its withdrawal from the Company or otherwise. An un-repaid capital contribution is not a liability of the Company or of any other Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any other Member's capital contributions.

Defendants suggest that this eliminates Hassanein's right to return of his capital contributions. It does not. When read in context, Section 3.3 modifies Section 3.2 and pertains only to additional capital contributions. The language "with its withdrawal from the Company or otherwise" signifies that the provision contemplates a factual scenario where a member leaves the entity and demands repayment of the capital contribution. Any other reading would lead to an absurd result by making 3.1(e)(ii) illusory. *See Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at \*3 (Del. Ch. Nov. 8, 2007) ("When interpreting contracts this Court gives meaning to every word in the agreement and avoids interpretations that would result in 'superfluous verbiage.'") (internal citations omitted); *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 741 (Del. Ch. 2008) ("It is a maxim of contract law that, given ambiguity between potentially conflicting terms, a contract should be read so as not to render any terms meaningless."). Instead, Section 3.3 reinforces the contractually limited remedies available to Class B members: the Class B member cannot seek refund of the Class B loan.

Hassanein also suggests that *Vinton* makes Eliovits subject to Section 18-502 because Eliovits was a signatory to the Agreement. As I ruled previously, the differences in the intent and construction of the Agreement here and the LLC operating agreement in *Vinton* make that holding factually inapplicable.

## C.     Hassanein has not shown that DBI was unjustly enriched

Hassanein pleads in the alternative that if his breach of contract claims fail, then DBI has been unjustly enriched.[31] To prove unjust enrichment one must show (1) an enrichment (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) lack of justification, and (5) absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

While unjust enrichment permits recovery absent a formal contract controlling the parties' relationships, "Where a contract is 'the measure of the plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.'" *Stein v. Wind Energy Holdings*, 2022 WL 17590862, at *9 (Del. Super. Dec. 13, 2022) (quoting *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979)). DBI was not a party to the Agreement, but the Agreement existed to create an investment vehicle in DBI. I reject Hassanein's narrow view that DBI must be a

---

[31] Compl. ¶¶ 58–65.

party to the contract.[32]  Such reading departs from the reality that Hassanein and Eliovits created NTO via agreement for the sole purpose of investing in DBI.  The Agreement provides Hassanein the rights to recover his investment.  A party cannot seek recovery under a theory of unjust enrichment "to circumvent an inadequate breach-of-contract claim."  *Stein*, 2022 WL 17590862, at *9 ("Even if the bargain (the parties) strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written.").  The poorly drafted Agreement does not provide Hassanein with the protections he now wishes to possess, but the Court must enforce the agreement before it.[33]  *See Glaxo Group Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) ("[P]arties have a right to enter into good and bad contracts, the law enforces both.  Holding sophisticated contracting parties to their agreement promotes certainty and predictability in commercial transactions.").

Even if Hassanein could bring suit against DBI, he has failed to prove impoverishment.  Hassanein admits receiving 300,000 Class B Units in exchange

---

[32] PAB at 19.

[33] While Hassanein contends that dismissing his unjust enrichment claim would result in him lacking any "remedy at law . . . under which to recover those "wrongly-acquired funds from DBI," his reasoning makes two consequential missteps.  PAB at 19.  First, it is not the Court that deprives Hassanein of legal remedy, but rather the controlling language of the contract that Hassanein bargained for.  Second, Hassanein assumes that DBI wrongly acquired the funds, which the Operating Agreement contradicts.  Hassanein has not adequately pleaded an impoverishment.  Instead, he seeks to circumvent the controlling language of the contract to more readily obtain repayment of his capital contribution.

for his investment.[34] Hassanein may have difficulty liquidating his investment, but that does not mean that he is impoverished or that DBI was unjustly enriched. He has not argued that the investment in DBI was a sham or was deceptive. Under the terms of the Agreement, Hassanein has priority for any Operating Distributions until the Class B Loans are paid in full.[35] Ostensibly, Hassanein may now seek to dissolve NTO and seek return on his investment. The fact that he has 300,000 Class B Units from his investment that could serve as his basis to dissolve the LLC and seek return on his investment from DBI only underscores that he was not impoverished.

## III. CONCLUSION

As established above, the Defendants' Motion to Dismiss is GRANTED and the Verified Amended Complaint is DISMISSED. This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

---

[34] Compl. ¶ 14.

[35] OA § 5.1(a)(i).